**EXHIBIT A**

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

## Case No. 12-80178-CIV-WILLIAMS

PALM BEACH GOLF CENTER-BOCA, INC.,

      Plaintiff,

vs.

JOHN G. SARRIS, D.D.S., P.A.,

      Defendant.

_____/

## <u>ORDER</u>

**THIS MATTER** is before the Court upon Defendant's Motion for Summary Judgment (DE 59-61), to which Plaintiff filed a Response (DE 75-76, 78) and Defendant filed a Reply (DE 82). The Court heard oral argument on the Motion on August 2, 2013 (DE 89, 95). In connection with this briefing, Defendant also filed a Motion to Strike (DE 80), to which Plaintiff filed a Response (DE 88). The Court addresses all related filings in this Order.

### I.    BACKGROUND

On December 13, 2005, a one-page fax advertising dental services may have been sent to a golf equipment store. The dentist never saw or approved the advertisement and the golf store owner does not remember ever seeing or receiving it. This four-year litigation spanning both state and federal courts ensued.

1

## A.    Defendant and Plaintiff

Defendant John G. Sarris, D.D.S., P.A. is a Florida dental practice owned by Dr. John G. Sarris.[1]  In 2003, Sarris engaged an independent contractor named Mike Roberts to provide marketing services to the dental practice, giving Roberts "free rein" to legally advertise the dental practice.  (DE 60-4, Roberts Aff. ¶ 8.)  In 2005, Roberts was solicited by Business to Business Solutions ("B2B"), the d/b/a of a woman from New York named Carol Abraham.  B2B was a middle person for a Romanian company known as Macaw, which provided fax advertisement services; B2B sold Macaw's services in the United States and made fax phone lines available to Macaw.[2]

B2B offered to send up to 10,000 fax advertisements for Roberts in exchange for $420.   Roberts communicated with individuals representing B2B, although never Abraham herself, to discuss a potential fax advertising campaign.  He specified that faxes should be sent to fax numbers only in specific zip codes near the dental practice and not to the fax numbers of other dental practices.  (Roberts Aff. ¶¶ 12-13.)  The last known communication between Roberts and B2B about proposed faxing occurred on December 1, 2005, when Roberts sent B2B a marked-up draft of a fax advertisement with the handwritten note, "Please refax me changes and I will sign off."  (Roberts Aff. ¶ 14.)   Roberts does not recall receiving a reply fax from B2B or signing off on any changes.  (Roberts Aff. ¶¶ 15-17.)  But on December 7, 2005, B2B received a check for $420 from Sarris Management Corporation, a separate company that pays bills for the

---

[1]      Dr. Sarris was previously dismissed as Defendant in his individual capacity by stipulation of the parties (DE 47).

[2]      For the purposes of Defendant's Motion, both parties treat B2B and Macaw as one entity and collectively refer to them as B2B, which the Court adopts for the purposes of this Order.

dental practice and is run by Sarris's wife.  (DE 60-6, Abraham Dep. Exs. at 32.)
Roberts never informed Sarris of his communications with B2B or the proposed fax
advertisement campaign.[3]  (Roberts Aff. ¶ 7; DE 60-3, Sarris Dep. at 19.)

Sarris became aware of the fax advertisement campaign by January 20, 2006,
when his attorney received a letter from Paul Price, attorney for the Presbytery of
Tropical Florida, stating that the Presbytery had received an unsolicited fax sent on
behalf of Sarris's dental practice, which it believed violated the Federal Telephone
Consumer Protection Act ("TCPA").  (Sarris Dep. at 22; DE 60-6, Abraham Dep. Exs. at
29-31.)  Upon receiving a copy of this letter, Roberts faxed it to B2B and asked that
B2B's law firm contact Sarris's attorney as soon as possible.  (Abraham Dep. Exs. at
27.)

Plaintiff Palm Beach Golf Center–Boca, Inc. ("Palm Beach Golf") is a golf
equipment store owned and operated by Larry Sugarman.  In 2005, Palm Beach Golf
had a fax machine on a dedicated phone line that printed faxes as they came in.  (DE
21-5 & 60-9, Sugarman Dep. at 15, 20, 45.)  When Sugarman noticed that the store was
receiving a lot of unwanted faxes, he told his employees to put those faxes in a box next
to the fax machine.  (Sugarman Dep. at 20, 24.)  At some point, he took an additional
step:  after receiving marketing materials from the Illinois law firm of Anderson &

---

[3]   In their sworn statements, both Roberts and Sarris aver that Roberts never informed
Sarris of his communications with B2B or the proposed fax advertisement campaign, and
Plaintiff has produced no evidence to the contrary.  Plaintiff has also proffered no evidence
regarding the circumstances surrounding Sarris Management Corporation's payment to B2B,
declining to depose either Sarris's wife, who runs that entity, or Roberts, who was the only
person in contact with B2B.

Wanca,[4] Sugarman contacted the firm and engaged Ryan Kelly, his attorney in the present lawsuit, who he perceived to be "a specialist in stopping faxes." (Sugarman Dep. at 26, 53-54.) Sugarman then gathered the unwanted faxes he had collected and sent them to Kelly. (Sugarman Dep. at 55.) Notably, Sugarman does not remember ever seeing a fax from Sarris's dental practice, does not have any knowledge that Palm Beach Golf ever received a fax sent on behalf of Sarris's dental practice, and cannot identify any Palm Beach Golf records or employees that could establish receipt of such a fax. (Sugarman Dep. at 19-22, 28, 64.)

### B.     Prior Litigation

The parties do not dispute that this case has its genesis in previous class action lawsuits in other Districts in which B2B was involved in selling fax advertisement services to U.S. customers.[5] Class counsel in four earlier TCPA lawsuits[6] sought fax transmission information from Abraham to try to define an identifiable class of fax recipients in those lawsuits, and Abraham eventually produced spreadsheets that she believed contained the information sought. In a deposition on December 14, 2008, Abraham, who was unrepresented by counsel, testified that her son Joel, who lived with her, had found back-up disks in his bedroom and a hard drive at their house that seemed to contain fax transmission information. Abraham also testified that B2B had

---

[4]     The contents of the letter Sugarman received from Anderson & Wanca are revealed below.

[5]     The parties provided detailed briefing on these facts in Plaintiff's Motion to Certify Class (DE 20, 21), Defendant's Response (DE 28) and Plaintiff's Reply (DE 38). The facts set forth here are undisputed and the Court considers them germane to this Order.

[6]     The lawsuits included *CE Design Ltd. v. Cy's Crabhouse North, Inc.*, No. 07 C 5456 (N.D. Ill.); *G.M. Sign Inc. v. Finish Thompson, Inc.*, No. 07 C 5953 (N.D. Ill.); and two others.

4

arranged for faxes to be sent on behalf of hundreds of other customers and not just the defendants in the four cases for which she was being deposed.

Although class counsel had already received the fax transmission information from Abraham related to the four lawsuits they were engaged in, after the deposition, class counsel promised Abraham in writing that they would enter a protective order preventing them from disclosing any additional information on the back-up disks and hard drive to third parties if she produced them. Class counsel made the same representation in a hearing before a federal judge in one of the four lawsuits. However, on January 8, 2009, class counsel deposed Abraham's son Joel, and, at the direction of his mother, he appeared with the back-up disks and hard drive containing the additional fax transmission information and gave it to class counsel.[7] Because class counsel subpoenaed Joel, not his mother, they did not find it "necessary" to rely on the entry of the promised protective order to obtain the information they were after. *See Reliable Money Order, Inc. v. McKnight Sales Co.*, 704 F.3d 489, 491-92 (7th Cir. 2013)

---

[7] Attorney Eric Rubin accompanied Joel to the deposition. After the deposition, Brian Wanca, class counsel and a colleague of Kelly at Anderson & Wanca, sent Eric Rubin a check for $5,000 with the memo-line message "document retrieval." *CE Design Ltd. v. Cy's Crabhouse N., Inc.*, No. 07 C 5456, 2010 WL 3327876, at *6 (N.D. Ill. Aug. 23, 2010). Rubin marked the check "void" and returned it to Wanca. *Id.* Addressing Wanca's actions, the Northern District of Illinois expressed "serious concern about the propriety of an attempted payment to a non-party in exchange for compliance with discovery requests." *Id.* Wanca and Kelly have both sworn that the $5,000 check was to compensate Abraham and her son for sitting for depositions and to allow them to buy a new computer (since they turned over computer hardware to class counsel). *Id.* But Rubin testified that he "regarded this as a check made out to [him] to induce [him] to convince Mrs. Abraham to go further and give them additional information." *Id.* at *7. Abraham herself testified that she thought the attempted payment was a "bribe." *Id.* In reviewing this evidence, the Northern District of Illinois declined to find that class counsel acted improperly, because the court had no direct evidence—such as an explicit communication between class counsel and Rubin—that the $5,000 check was sent to induce Abraham's cooperation, and Rubin had returned the check to class counsel. *Id.*

(summarizing events); *CE Design Ltd. v. Cy's Crabhouse N., Inc.,* No. 07 C 5456, 2010 WL 3327876 (N.D. Ill. Aug. 23, 2010) (summarizing events).

By January 13, 2009, Plaintiffs' expert in those cases and the present case, Robert Bigerstaff, received the back-up disks to analyze and found what he determined to be fax transmission information for thousands of alleged fax recipients. Upon receipt of this information, Plaintiff's counsel in this case sent solicitation letters to the alleged fax recipients identified by Bigerstaff.[8] Plaintiff in the present case disclosed the solicitation letter he received from Kelly, which stated:

> My law firm litigates class action lawsuits against companies which send junk faxes. It is unlawful to send advertising faxes without obtaining the recipients' prior express permission or invitation. We try to recover compensation for the recipients of junk faxes and also attempt to stop future junk faxes.
>
> During our investigation, we have determined that you are likely to be a member of the class. You might not remember receiving junk faxes, but if the lawsuit is successful, you would receive compensation (up to $1,500) for each junk fax sent.
>
> We would like to discuss this issue with you. Please call me at [telephone number]. Very truly yours, Anderson & Wanca, Ryan M. Kelly

(DE 28-16, Pl.'s Resps. to Defs.' Request for Prod. at 10; *see also* DE 28-13, Solicitation Letters.) The words "Advertising Material" appear at the bottom of the letter.[9]

---

[8]     The irony of a situation where Plaintiff's counsel sent out an unsolicited advertisement to find plaintiffs who were willing to bring lawsuits for receiving an unsolicited advertisement is not lost on the Court.

[9]     Abraham has testified that Kelly and his law firm Anderson & Wanca have filed at least 134 lawsuits using the information obtained from the back-up disks the Abrahams produced. (DE 28-17, Abraham Aff. ¶ 7 & Ex. A (listing 134 lawsuits).)

### C.    The Present Litigation

On June 9, 2009, Palm Beach Golf entered into a retainer agreement with Anderson & Wanca and another Illinois law firm, Bock & Hatch LLC, which included a contingency clause—an agreement that attorneys' fees are owed only upon a successful outcome in the lawsuit—that provided for a fee equal to one-third of any benefit conferred upon the class. (DE 28-21, Retainer Agreement.) On July 9, 2009, the law firms filed three TCPA class action lawsuits on behalf of Palm Beach Golf in Florida state court, including the present lawsuit.[10]

In this lawsuit, Palm Beach Golf raises two claims against the Sarris dental practice: (1) violations of the TCPA, 47 U.S.C. § 227, and (2) state law conversion.

---

[10]    The other two lawsuits were *Palm Beach Golf Center–Boca, Inc. v. ADCAHB Medical Coverages, Inc.*, No. 09-CA-23363 (Fla. Cir. Ct. July 9, 2009), and *Palm Beach Golf Center–Boca, Inc. v. Boca Raton Florist, Inc.*, No. 09-CA-23367 (Fla Cir. Ct. July 9, 2009). (Abraham Aff. Ex. A.) In the *ADCAHB* matter, Sugarman was deposed on June 23, 2010, and testified not only that he was unaware of ever receiving a fax forming the basis of the *ADCAHB* lawsuit, but also that he was unaware of any details concerning the other two lawsuits in which his company was the sole named plaintiff:

> Q: [A]m I therefore correct in stating that you don't have personal knowledge whether [the fax at issue] actually was faxed to the Boca store?
> A: I do not.
> Q: Has Palm Beach Golf Center filed any other lawsuits in regard to [the fax at issue] or any other junk faxes?
> A: No, sir.
> Q: And I'm not here to trick you, but I am presently defending a lawsuit that the Palm Beach Golf Center–Boca, Inc. has brought against a dentist by the name of Sarris.
> A: Oh.
> Q: Are you aware of that?
> A: I – yeah, I'm sorry. There were, I guess, two other – two other lawsuits.
> Q: When you say two other lawsuits, another one besides Dr. Sarris and this one?
> A: Yeah.
> Q: What is the other one?
> A: I don't remember right at the moment.
> Q: Well, do you remember whether it was an individual or a business that you sued in the other lawsuit?
> A: I don't remember. (DE 28-23, Sugarman Dep. in *ADCAHB* at 30-31.)

Although Palm Beach Golf is the Plaintiff and proposed Class Representative, Sugarman testified that he did not review the complaint before it was filed and was not aware it was a class action lawsuit. (Sugarman Dep. at 26, 42.) The Second Amended Complaint ("SAC" or "complaint"), the operative pleading, was filed in Florida state court on September 7, 2010. Following the Supreme Court opinion in *Mims v. Arrow Financial Services, LLC*, 132 S.Ct. 740 (2012), which held that federal courts have federal question jurisdiction over private suits arising under the TCPA, Defendant removed the action to this Court on February 16, 2012. (DE 1.)

Plaintiff's claims are predicated solely upon the Bigerstaff report.[11] The report states that data contained on the back-up disk (obtained from Abraham's son) show that there was an error-free transmission of a one-page fax to 7,058 unique fax numbers on December 13 and 14, 2005.[12] (DE 78-1, Bigerstaff Report ¶ 17 & Exs. 3-6.) The report

---

[11] In his deposition in the *ADCAHB* matter, Sugarman testified that the Bigerstaff report was the sole basis for his belief that Palm Beach Golf received the fax at issue. (Sugarman Dep. in *ADCAHB* at 36.) In his deposition in the present matter almost a year later, Sugarman no longer remembered what the Bigerstaff report was or that he had stated it formed the basis of his claim in the *ADCAHB* matter. (Sugarman Dep. at 29, 32 ("I don't remember what my recollections are. I mean, if – if that's what I said, that's what I said. I don't know I – sitting here right now, I don't why I said that.") Nonetheless, the only evidence Plaintiff has proffered to show that a fax was sent to its fax number is the Bigerstaff report. At oral argument, Plaintiff's counsel stated, "we are not proving our case through Mr. Sugarman; we're proving our case through Mr. Bigerstaff and the electronic data." (DE 95, Hrg. Tr. at 21.) Defense counsel concurred, saying Sugarman "admittedly has no evidence, zero, besides what the plaintiff's attorneys have provided." (Hrg. Tr. at 37.) Moreover, the fax attached to the complaint, which is the same as that attached to the Bigerstaff report, does not contain a header showing a fax number for a sender or recipient or any other identifying information. (SAC Ex. A; Sugarman Dep. at 64.)

[12] The Bigerstaff report does not once mention Plaintiff or its fax number, and neither Plaintiff's statement of facts nor its brief in response to Defendant's Motion for Summary Judgment establish that Plaintiff's fax number was among the 7,058 numbers to which a one-page fax was allegedly sent. The closest Plaintiff's brief comes to bridging that gap is the contention that Defendant "does not dispute that advertisements for its chiropractic business were sent by fax to fax machines, including Plaintiff's." (DE 75, Resp. to MSJ at 6.) Aside from

also includes a copy of a one-page fax containing an advertisement for the Sarris dental practice that was also retrieved from the back-up disk. (Bigerstaff Report ¶ 12 & Ex. 2.) The report does not go so far as to say that the transmission to 7,058 unique fax numbers was of the advertisement for the Sarris dental practice, but it appears in the briefing that Plaintiff's argument rests on that assumption. (*See* DE 76, Pl.'s Statement of Material Facts in Opp'n to Def.'s Mot. for Summ. J. ("PSOF") ¶ 9.)

## II.  DISCUSSION

Defendant has moved for summary judgment on both claims. Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Under this standard, "[o]nly disputes over facts that might affect the outcome of the suit under the governing [substantive] law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). And any such dispute is "genuine" only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

In evaluating a motion for summary judgment, the Court considers the evidence in the record, "including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). The Court "must view all the evidence and all

the glaring inaccuracy regarding Defendant's business—Defendant is a dental practice, not a chiropractic business—the brief also mischaracterizes Defendant's position. (*See, e.g.*, DE 61, MSJ at 1 ("[T]he alleged fax advertisement *purportedly* received by Palm Beach was undisputedly sent by B2B, a New York company, in conjunction with a Romanian company by the name of Macaw.").) But, in its Motion for Class Certification, Plaintiff did proffer evidence that its fax number was among those listed in the Bigerstaff Report. (DE 21, Memo in Supp. of Mot. for Class Cert. at 6 (citing Sugarman Dep. at 16 (identifying Palm Beach Golf's fax number); Bigerstaff Report Ex. 5, p. 98, line 4606; Ex. 7, p. 3, line 671).)

factual inferences reasonably drawn from the evidence in the light most favorable to the nonmoving party, and must resolve all reasonable doubts about the facts in favor of the non-movant." *Rioux v. City of Atlanta*, 520 F.3d 1269, 1274 (11th Cir. 2008) (quotation marks and citations omitted). At the summary judgment stage, the Court's task is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. If the movant establishes the absence of a genuine issue of material fact, the non-movant party must "go beyond the pleadings and by her own affidavits or by the 'depositions, answers to interrogatories, and admissions on file' designate 'specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (quoting Fed. R. Civ. P. 56(c)).

Finally, "[s]ummary judgment for a defendant is appropriate when the plaintiff 'fails to make a sufficient showing to establish the existence of an element essential to [his] case, and on which [he] will bear the burden at trial." *Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 805-06 (1999) (quoting *Celotex*, 477 U.S. at 322). Thus, "[i]f the non-movant . . . fails to adduce evidence which would be sufficient . . . to support a jury finding for the non-movant, summary judgment may be granted." *Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1370 (11th Cir. 1997) (citation omitted).

### A.     The TCPA Claim

The TCPA, 47 U.S.C. § 227(b)(1)(C), makes it unlawful for any person to use a fax machine, computer or other device to send an unsolicited advertisement to a fax machine if the sender or recipient is in the United States, subject to some exceptions

10

that are not relevant in the context of Defendant's Motion.  The statute provides for a private right of action for injunctive relief and for damages equal to the actual monetary loss or $500 for each violation.  47 U.S.C. § 227(b)(3).  A court has discretion to award up to $1,500 for each violation if it finds that a defendant willfully or knowingly violated the statute.  *Id.*

In Count I of the complaint, Plaintiff alleges that Defendant sent a fax advertisement to Plaintiff without Plaintiff's permission, giving rise to a TCPA claim. (SAC ¶¶ 14-15, 32.)  However, in its summary judgment briefing as well as at oral argument, Plaintiff does not claim that Defendant sent a fax that Plaintiff received, but rather avers that the Bigerstaff report shows that B2B electronically transmitted a fax to Plaintiff's fax machine in contravention of the TCPA.  (Resp. to MSJ at 4; Hrg. Tr. at 21 ("Judge, we are not proving our case through Mr. Sugarman [Plaintiff], we're proving our case through Mr. Biggerstaff and the electronic data.").)  In such an instance, Plaintiff can only establish liability on a theory of vicarious liability.

### 1.      Vicarious Liability Under the TCPA

The Bigerstaff report is Plaintiff's evidence that a fax connection—an electronic handshake—occurred between a B2B computer and Plaintiff's fax machine on December 13, 2005 to transmit a one-page fax.  However, it is undisputed that Sarris neither sent a fax on Defendant's behalf nor knew one was sent and that Plaintiff did not know it received a fax, let alone what its content was.  The Court begins with the issues raised by the first proposition, that is, in the absence of direct liability, whether Defendant can be held vicariously liable under the TCPA for the acts of B2B.

11

In a recent declaratory ruling, the Federal Communications Commission ("FCC"), which oversees the TCPA, elaborated on the scope of vicarious liability under sections 227(b) and (c) of the TCPA. *In re Joint Petition filed by Dish Network LLC*, 28 FCC Rcd. 6574 (2013). There, three petitioners (including Dish Network, against which TCPA claims were alleged) sought an FCC ruling as to whether the provisions of the TCPA created liability for a seller if the illegal advertising calls in question were not initiated or physically placed by the seller, but rather by the seller's third-party marketer. *Id.* at 6578. The FCC requested public comment on this question and, more specifically, asked what legal principles should be used to define "on behalf of" liability for a seller under the TCPA. *Id.* at 6578-79.

Section 227(b)(1)(B) of the TCPA, addressing telemarketing, states that a party must "initiate" a call to be liable under that section. Among the numerous responses the FCC received to its request for public comment, some parties took the position that, because the FCC regulations implementing the TCPA defined the term "initiate" as encompassing a person on whose behalf a communication is made, there is no need to import agency principles into the construction of the TCPA. *Id.* at 6579-81. The FCC disagreed with that position, noting that the TCPA itself does not define "initiate" or "on behalf of" and that the FCC has long drawn a distinction "between the telemarketer who initiates a call and the seller on whose behalf a call is made." *Id.* at 6582.

Examining its regulations and precedent, the FCC concluded that "a seller is not directly liable for a violation of the TCPA unless it initiates a call, but may be held vicariously liable under federal common law agency principles for a TCPA violation by a

12

third-party telemarketer." *Id.* In rejecting the notion that the TCPA is a strict liability statute, the FCC declared that,

> under our current rules and administrative precedent interpreting and implementing sections 227(b) and 227(c), we do not think that an action taken for the benefit of a seller by a third-party retailer, without more, is sufficient to trigger the liability of a seller under either section 227(c) or section 227(b). However, we see no reason that a seller should not be liable under those provisions for calls made by a third-party telemarketer when it has authorized that telemarketer to market its goods or services. In that circumstance, the seller has the ability, through its authorization, to oversee the conduct of its telemarketers, even if that power to supervise is unexercised.

*Id.* at 6593 & n.140.[13]

Federal common law principles of agency apply to allegations of TCPA violations committed by third-party marketers. *Id.* at 6584. The FCC views agency broadly; a seller may be liable for third-party acts under the principles of formal agency, apparent authority and ratification. *Id.* "The classical definition of 'agency' contemplates 'the fiduciary relationship that arises when one person (a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf and subject to the principal's control." *Id.* at 6586 (quoting Restatement (Third) of Agency

---

[13]    In their briefs, both parties cite *Dish Network* to state the standard for vicarious liability under the TCPA. (*See* MSJ at 6-7; Resp. to MSJ at 10.) Indeed, a district court must apply a final order of the FCC in deciding an issue addressed by the order. *See* 28 U.S.C. § 2342(1). Here, the *Dish Network* order explicitly addressed vicarious liability under sections 227(b) and (c) of the TCPA, even though it specifically examined the meaning of the word "initate" as used in the telemarketing prohibition of section 227(b)(1)(B) instead of the word "send" as used in the unsolicited fax prohibition of section 227(b)(1)(C). *See* 28 FCC Rcd. at 6581-82. The order also specifically addressed the term "seller" in the telemarketing context, not "sender" in the fax context. *Id.* As the Northern District of Illinois has pointed out, however, while the FCC regulations define these terms separately, they are substantially similar as used in the regulations for the purposes of vicarious liability. *Savanna Group, Inc. v. Trynex, Inc.*, No. 10 C 7995, 2013 WL 4734004, at *5 (N.D. Ill. Sept. 3, 2013) (comparing 47 C.F.R. § 64.1200(f)(9) and (f)(10)). Considering all of these factors, *Dish Network* applies to the issues of vicarious liability in this case.

("Restatement") § 1.01).   The doctrine of apparent authority "holds a principal accountable for the results of third-party beliefs about an actor's authority to act as an agent when the belief is reasonable and is traceable to a manifestation of the principal." *Id.* (quoting Restatement § 2.03, cmt. c).  And the doctrine of ratification provides that a principal may be liable if it ratifies the acts of an agent by knowingly accepting the benefits of the acts, such as "through conduct justifiable only on the assumption that the person consents to be bound by the act's legal consequences."  *Id.* at 6587 (quoting Restatement § 4.01, cmt. d).

### a.   Failure to Plead Vicarious Liability

In its Motion, Defendant first argues that it is entitled to summary judgment on Plaintiff's TCPA claim because it is undisputed that Defendant did not send an unsolicited fax advertisement and Plaintiff failed to make any allegations of vicarious liability in the complaint.  (MSJ at 5-7 & n.2; DE 82, Reply to MSJ at 5.)  In response, Plaintiff cites pre-*Dish Network* decisions to make an argument similar to one made in *Dish Network*:  since an FCC regulation defined "sender" for purposes of a TCPA violation as the person on whose behalf a broadcaster sends a fax, Plaintiff's right of action arises directly from the provisions of the TCPA and not common law principles of agency.  (Resp. to MSJ at 8-9 (quoting 47 C.F.R. § 64.1200(f)(10)).)  As discussed above, the FCC rejected this argument.  In the fax transmission context, *Dish Network* stands for the proposition that a party is not directly liable for a TCPA violation unless it actually transmits a fax, but the party may be vicariously liable under federal common law principles of agency for the actions of a third-party.  28 FCC Rcd. at 6582.

14

Plaintiff's Response does not address Defendant's contention that Plaintiff improperly failed to allege vicarious liability in the complaint. However, at oral argument, the Court asked Plaintiff's counsel why the complaint contained no allegations of agency relationship, apparent authority or vicarious liability, and why that deficiency does not undermine liability on the part of the Sarris dental practice. (Hrg. Tr. at 25.) Plaintiff replied by referring again to the definition of "sender" in the FCC regulation, disagreeing that vicarious liability should have been pled under the facts of this case. (Hrg. Tr. at 25-27.)

If a plaintiff's theory of recovery against a defendant is premised upon vicarious liability, it must be alleged in the complaint. *Prager v. FMS Bonds, Inc.*, No. 09-80775-CIV, 2010 WL 2950065, at *9 (S.D. Fla. July 26, 2010) (citing Florida state law and stating that vicarious liability must be pled in the complaint); *Jurimex v. Case Corp.*, 201 F.R.D. 337, 341 (D. Del. 2001) (concluding that plaintiff both improperly failed to join subsidiaries that actually took the actions alleged in the complaint, such that it was possible that plaintiff could sue subsidiaries separately in another forum, and improperly failed to allege vicarious liability against defendant parent company, warranting dismissal of complaint). Summary judgment is appropriate in instances where a plaintiff fails to allege vicarious liability in the complaint and where, in fact, the conduct alleged in the complaint was not defendant's, but rather that of defendant's agents. *Schaffer v. A.O. Smith Harvestore Prods., Inc.*, 74 F.3d 722, 731 (6th Cir. 1996) (approving the district court's finding that separate entities are "entitled to be treated as such" and granting summary judgment for defendant upon plaintiff's failure to allege a theory of vicarious liability linking defendant to the acts alleged in the complaint). A plaintiff may

15

not make a claim of vicarious liability for the first time in its response to defendant's motion for summary judgment. *Computer Aid, Inc. v. Hewlett-Packard Co.*, 56 F. Supp. 2d 526, 537-38 (E.D. Pa. 1999) (finding that plaintiff may not go beyond the scope of its pleadings in its response to defendant's summary judgment, and granting defendant's motion for summary judgment for plaintiff's failure to plead vicarious liability).

Since Plaintiff agreed to dismiss its claims against Dr. Sarris, only Plaintiff's claims against the Sarris dental practice remain. In the complaint, Plaintiff's factual allegations are, quite simply, that Defendant—the Sarris dental practice—transmitted a fax advertisement to Plaintiff without Plaintiff's permission. (SAC ¶¶ 14-15.) Plaintiff does not name B2B as a party in this matter and never mentions B2B in the complaint.[14] But the facts are undisputed—and Plaintiff concedes—that an alleged fax was sent by B2B, not Defendant. (Resp. to MSJ at 4 (claiming that B2B and Macaw transmitted a fax to Plaintiff).) Therefore, the only theory of liability against Defendant under the TCPA that is supported by the facts is vicarious liability, which Plaintiff plainly failed to plead and raised only in its summary judgment briefing. This defect is, by itself, fatal at the summary judgment stage.[15] *See Schaffer* 74 F.3d at 731; *Computer Aid*, 56 F. Supp. 2d at 537-38.

---

[14]   Although not argued by Defendant, it may also be true that B2B as the alleged agent of Defendant should have been joined as a necessary party under Federal Rule of Civil Procedure 19. *See Jurimex*, 201 F.R.D. at 340-41.

[15]   In *Dish Network*, the FCC notes that nothing in its ruling "requires a consumer to provide proof—at the time it files its complaint—that the seller should be held vicariously liable for the offending call." 28 FCC Rcd. at 6593. This is consistent with the requirements of Federal Rule of Civil Procedure 8, which requires that a complaint need not contain proof, but rather enough factual content "to raise a reasonable expectation that discovery will reveal evidence" of a claim. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 556 (2007). Here, the complaint's factual content

16

Plaintiff cannot contend that it had no knowledge of B2B at the time it first filed a complaint against Defendant. Indeed, the facts are undisputed that this lawsuit arose from Plaintiff's counsel's knowledge of and relationship with B2B. It was a moment of odd providence that led to Plaintiff's counsel discovering B2B's back-up disk containing information that Plaintiff's expert testified is evidence that a one-page fax was sent by B2B to Plaintiff. Plaintiff's counsel knew from the very outset that the only theory of liability against the Sarris dental practice under which Plaintiff could travel was vicarious liability, yet Plaintiff failed to plead that claim or its factual basis in the complaint.

### b.    Insufficiency of Evidence

Even if the Court were to excuse Plaintiff for failing to plead vicarious liability on account of any arguably unsettled principles of liability under the TCPA when Plaintiff filed its complaint (that is, before *Dish Network*), the facts proffered by Plaintiff, even if true, are not sufficient to establish vicarious liability on the part of Defendant under the TCPA. In its Response to Defendant's Motion for Summary Judgment—for the first time—Plaintiff offers three theories of vicarious liability against Defendant: formal agency, apparent authority and ratification. (Resp. to MSJ at 11-17.) Defendant argues it is entitled to summary judgment on all three theories. (MSJ at 7-14; Reply to MSJ at 5-10.) The Court addresses each in turn.

### i.    Formal Agency

Formal agency liability requires a showing that a principal "manifests assent" to an agent that the agent act on behalf of the principal and subject to the principal's

---

does not begin to address vicarious liability, Plaintiff's only theory of liability against the named Defendant.

17

control.  *Dish Network*, 28 FCC Rcd. at 6586; *see also* Restatement § 1.01.  Thus, for Plaintiff to demonstrate a formal agency relationship between Defendant and B2B, Plaintiff must show Defendant had control of B2B's actions.  *See Mais v. Gulf Coast Collection Bureau, Inc.*, No. 11-61936-CIV, 2013 WL 1899616, at *13-14 (S.D. Fla. May 8, 2013); *Lobegeiger v. Celebrity Cruises, Inc.*, 869 F. Supp. 2d 1350, 1356 (S.D. Fla. 2012).

The TCPA prohibits only faxes of certain content—that is, advertisements—from being sent; it does not prohibit other kinds of faxes.  47 U.S.C. § 227(b)(1)(C).  As a result, in the context of Plaintiff's burden to show that B2B acted on behalf of Defendant for purposes of the alleged TCPA fax violation, it is essential that Plaintiff demonstrate that Defendant controlled the fax content.

Reviewing the parties' factual contentions, the parties do not dispute that Roberts handled the marketing for Defendant in 2005.[16]  They do dispute his employment status; Sarris has averred that Roberts was an independent contractor and Roberts has testified that he had "free rein" to do his work, (Sarris Dep. at 12-13; Roberts Aff. ¶ 8), while Plaintiff cites facts to argue that Roberts was for all intents and purposes an employee of Defendant, (Roberts Aff. ¶¶ 3-4).  Notwithstanding their different characterizations, the parties agree that B2B solicited Roberts in 2005 to conduct a fax advertisement campaign for Roberts in exchange for $420, and Roberts exchanged communications with B2B employees to discuss the content of the fax advertisement

---

[16]  It is also undisputed that Sarris himself knew nothing of B2B or the proposed fax advertisement campaign, leaving marketing of the dental practice completely in the hands of Roberts.  (*See, e.g.*, Sarris Dep. at 24-25, 34-36.)

and its target market. (Roberts Aff. ¶¶ 6, 12-14.) Abraham never communicated with Roberts, but, at her deposition, she produced a B2B client table and emails as evidence that Roberts communicated with other B2B employees, none of whom provided testimony in this case.[17] (*See* Abraham Dep. at 56-62.)

As to the client table for Roberts, Abraham testified that the field designated for the date on which a customer approved a fax advertisement for transmission was left blank. (Abraham Dep. at 70-71.) Roberts stated that, in his last communication with B2B regarding the proposed fax, he requested changes to the fax content, and he never received a response from B2B, signed off on any changes, or approved the content of the fax for transmission. (Roberts Aff. ¶¶ 14-17.) Plaintiff has produced no evidence that Roberts did approve the fax,[18] asking the Court instead to consider evidence of B2B's custom and practice—that B2B ordinarily would have obtained a customer's

---

[17] Although the Abraham deposition was taken by Defendant in the context of this lawsuit, Plaintiff was represented at the deposition by Tod Allen Lewis, an Illinois attorney who was not admitted to practice law in Florida or the U.S. District Court for the Southern District of Florida. This is the subject of Defendant's Motion to Strike (DE 80), which is addressed in this Order.

[18] Plaintiff never deposed Roberts—who is undisputedly a central figure in this lawsuit— before the June 7, 2013 discovery deadline, even though Plaintiff was aware of Roberts at least since 2010. After the close of discovery, Plaintiff moved the Court to re-open discovery so that it could depose Roberts, inaccurately representing to the Court that it saw Roberts' affidavit for the first time on June 14, 2013. (DE 63.) In fact, even the Court had received Roberts' affidavit in December 2012 when it was attached to a brief filed by Defendant. The Court denied Plaintiff's motion, finding that Plaintiff failed to exercise reasonable diligence in conducting discovery and had no excuse for its neglect. (DE 66.)

The record reveals a pattern of inattention by Plaintiff: calling Defendant a chiropractic instead of dental practice; failing to identify Roberts as a key witness, take notice of Roberts' affidavit or ever depose him; sending an attorney to defend a deposition who was not admitted to practice law in the Southern District of Florida; filing a motion to appear *pro hac vice* after the attorney had already appeared that was itself defective for not complying with the Local Rules (*see* DE 57, 62); and failing to plead vicarious liability in the complaint or identify B2B, not Defendant, as the entity whose alleged actions could give rise to Plaintiff's claims.

19

approval of a fax—as raising a genuine issue whether Roberts assented to the fax for transmission. (Resp. to MSJ at 12-14.)

Construing the facts in Plaintiff's favor, Plaintiff cannot demonstrate that Defendant controlled the content of the fax allegedly sent by B2B, which is an essential element of its vicarious liability claim under the TCPA. Roberts has testified under oath that he did not approve the fax content, and there is no evidence that the content was ever seen or approved by anyone else. By raising evidence of B2B's custom and practice, Plaintiff does not create a genuine dispute of material fact; even if B2B sometimes or usually obtained customer approval of the contents of a fax, there is no evidence B2B did so in this case. Indeed, the evidence, by way of Roberts' affidavit, is that B2B did not. Because the TCPA sets forth a content-specific prohibition on faxes, Plaintiff cannot make a showing of formal agency to support vicarious liability under the TCPA against Defendant.[19] *See Mais*, 2013 WL 1899616, at *13-14 (finding plaintiff did not make a sufficient showing of defendant's control over its alleged agent to sustain a claim of vicarious liability under section 227(b) of the TCPA). Defendant is therefore entitled to summary judgment on this theory. *See Brooks*, 116 F.3d at 1370 (citing *Celotex*, 477 U.S. at 322-23); *Ryan v. Int'l Union of Operating Engineers, Local 675*, 794 F.2d 641, 647 (11th Cir. 1986) (granting defendant's motion for summary judgment

---

[19]     At oral argument, counsel for Defendant drew an analogy between this case and a situation in which a contractor (as alleged agent) constructs a building for a customer (as alleged principal) but never obtains final approval on the plans for the building, and a third party is injured by a defect in the building. Counsel for Defendant argued that the principal, having not approved the building plans, could not be held liable for the third-party injury. (Hrg. Tr. at 34.) The analogy is appropriate to the extent that a third-party could not properly bring a claim against the principal for the contents of the building in that scenario, or the contents of a fax under the TCPA in this case, absent a manifestation of assent by the principal.

where plaintiff produced no evidence that defendant provided an agreement that was an essential element of plaintiff's claim).

### ii.    Apparent Authority

Plaintiff's second theory of vicarious liability against Defendant, apparent authority, requires proof of three elements:   "(1) a representation by the purported principal; (2) reliance on that representation by a third party; and (3) a change in position by a third party in reliance upon such a relationship." *Nat'l Auto Lenders, Inc. v. SysLOCATE, Inc.*, 686 F. Supp. 2d 1318, 1322 (S.D. Fla. 2010) (citing *Blunt v. Tripp Scott, P.A.*, 962 So. 2d 987, 989 (Fla. 4th DCA 2007)).  "'The reliance of a third party on the apparent authority of the principal's agent must be reasonable and rest in the actions of or appearances created by the principal.'" *Id.* (quoting *Blunt*, 962 So. 2d at 989).

The undisputed facts of this case cannot support a claim of apparent authority liability.  As Defendant points out in its Motion, Plaintiff's complaint alleges only that Defendant sent a fax.  (*See* MSJ at 11-12.)  To the extent that demonstrating apparent agency requires a plaintiff to show it reasonably believed an agent was acting on behalf of a principal, Plaintiff's own complaint states otherwise when it alleges that Plaintiff believed Defendant (the now-alleged principal) sent a fax, not B2B (the now-alleged agent).  (SAC ¶ 14.)  The Restatement forthrightly provides that "[a]pparent authority is not present when a third party [Plaintiff] believes that an interaction is with an actor who is a principal."  Restatement § 2.03(f).

In any event, there is not a scintilla of evidence that Plaintiff ever knew it received any fax from Defendant.  Indeed, Plaintiff's complaint never alleges Plaintiff received a

21

fax, only that Defendant sent one. It is therefore impossible for Plaintiff to show it ever relied on a representation of B2B or that Plaintiff changed its position in reliance on an apparent agency relationship. In short, Plaintiff has provided no facts to support its new claim of apparent agency liability, and Defendant is thus entitled to summary judgment on this theory.

### iii. Ratification

To prove its third theory of vicarious liability, ratification, Plaintiff has the burden of showing that "'the benefits of the purportedly unauthorized acts are accepted [by Defendant] with full knowledge of the facts under circumstances demonstrating the intent to adopt the unauthorized arrangement.'" *Nat'l Auto Lenders*, F. Supp. 2d at 1323 (quoting *In re Securities Group*, 926 F.2d 1051, 1054 (11th Cir. 1991)); *see also* Restatement § 4.01. "'Before one may infer that a principal ratified the unauthorized act of his agent, the evidence must demonstrate that the principal was fully informed and the he approved of the act.'" *Id.* (quoting *United Parcel Serv., Inc. v. Buchwald Jewelers*, 476 So. 2d 772, 773 (Fla. 3d DCA 1985)).

Aside from the much-discussed pleading deficiencies, which are again present with respect to Plaintiff's new ratification claim, the sole fact Plaintiff proffers to support its ratification claim is that, a month after the alleged faxing occurred, Defendant received a letter from an attorney claiming his client had received an unsolicited fax. (*See* Resp. to MSJ at 17.) In its brief, Plaintiff alleges, without factual support, that when Defendant received this letter, it "did not object that it was unaware of the faxing or that the faxing was unauthorized." (Resp. to MSJ at 17.) Even if these allegations were enough to somehow demonstrate ratification, Plaintiff's assertions—made only in

22

its briefing and without any evidentiary support—are not sufficient to defeat summary judgment. *See Celotex*, 477 U.S. at 324. Furthermore, if anything, the facts surrounding Defendant's reaction to receipt of the letter—immediate contact with B2B's attorney regarding the claim—show repudiation, not ratification, of B2B's acts. *See McDonald v. Hamilton Electric, Inc. of Fla.* 666 F.2d 509, 514 (11th Cir. 1982) (finding ratification was not present unless principal with knowledge of material facts regarding the unauthorized transaction took a position inconsistent with an intent to repudiate the transaction). Finally, Plaintiff has not pointed to any evidence that Defendant was fully informed of the material facts surrounding B2B's actions. *See id.* For all of these reasons, Plaintiff's theory of ratification liability fails, and summary judgment is granted for Defendant on this theory.

### 2.      Article III Case-or-Controversy Standing

It is also undisputed in this case that Plaintiff did not know it received the fax that forms the basis of its claims against Defendant, let alone what the content of the fax was. These circumstances raise the question of whether Plaintiff suffered any injury sufficient to give it standing to bring this case in federal court—a question that must bear the Court's *sua sponte* scrutiny.

"Article III of the Constitution limits the judicial power of the United States to the resolution of Cases and Controversies, and Article III standing . . . enforces the Constitution's case-or-controversy requirement." *Hein v. Freedom from Religion Found., Inc.*, 551 U.S. 587, 597-98 (2007) (internal quotations and citations omitted). An analysis of standing requires an examination of "whether the particular plaintiff is entitled to an adjudication of the particular claims asserted." *Allen v. Wright*, 468 U.S.

737, 752 (1984). "'[A] plaintiff must demonstrate standing for each claim he seeks to press' and 'for each claim of relief' sought." *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008) (quoting *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006)).

To have Article III standing, a plaintiff must show (1) an "injury in fact" that is concrete, particularized, and actual or imminent (as opposed to conjectural or hypothetical); (2) that the injury is fairly traceable to the challenged action of the defendant; and (3) that it is likely (as opposed to merely speculative) that the injury will be redressed by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992); *see also Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009). Each element of standing "must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." *Lujan*, 504 U.S. at 561. Therefore, when standing is examined at the summary judgment stage, the plaintiff may not rest on "mere allegations" and must "'set forth' by affidavit or other evidence 'specific facts' . . . which for the purposes of the summary judgment motion will be taken to be true." *Id.* (quoting Federal Rule of Civil Procedure 56).

Federal courts are "under an independent obligation to examine their own jurisdiction, and standing 'is perhaps the most important of [the jurisdictional] doctrines.'" *FW/PBS, Inc. v. Dallas*, 493 U.S. 215, 231 (1990) (quoting *Allen*, 468 U.S. at 750). Thus "it is well settled that a federal court is obligated to inquire into subject matter jurisdiction *sua sponte* whenever it may be lacking." *Univ. of S. Alabama v. Am. Tobacco Co.*, 168 F.3d 405, 410 (11th Cir. 1999); *see also Cuban Am. Bar Ass'n v. Christopher*, 43 F.3d 1412, 1422 (11th Cir. 1995) (noting that "'[b]efore rendering a

24

decision . . . every federal court operates under an independent obligation to ensure it is presented with the kind of concrete controversy upon which its constitutional grant of authority is based; and this obligation on the court to examine its own jurisdiction continues at each stage of the proceedings, even if no party raises the jurisdictional issue and both parties are prepared to concede it'"). At the summary judgment stage, if "evidence relating to standing is squarely in contradiction to central matters *and* requires credibility findings," a district court must conduct an evidentiary hearing. *Bischoff v. Osceola Cnty., Fla.*, 222 F.3d 874, 881 (11th Cir. 2000). However, where the evidence relating to standing is not contradictory, an evidentiary hearing is unnecessary. *Brown v. Showboat Atl. City Propco, LLC*, No. 08-5145(NLH), 2010 WL 5237855, at *5 n.9 (D.N.J. Dec. 16, 2010).

Here, the Court examines Plaintiff's standing to bring this action *sua sponte*, as it must. Because no evidentiary contradictions related to standing are present—indeed, a lack of standing is indicated by Plaintiff's evidence itself—the Court has declined to hold an evidentiary hearing related to standing.[20]

### a.    Statutory Provisions

In a variety of contexts throughout this litigation, Plaintiff has argued that it need not show that it received Defendant's fax advertisement because "[t]he TCPA prohibits the *sending* of an unsolicited advertisement by fax, not the *receipt* of such a fax." (*See*

---

[20]    Defendant only raised the issue of Plaintiff's standing in its responses to Plaintiff's Motions in Limine. (DE 81, Resp. to Mots. in Limine at 9-10.) At oral argument, the Court raised the issue of standing as a matter of the Court's subject matter jurisdiction over this action. Because the Court examines Plaintiff's standing *sua sponte* and discerns no evidentiary contradictions requiring a hearing, the Court denied Plaintiff's request at oral argument to provide additional briefing, which would only have served to further prolong this four-year litigation. (Hr'g Tr. at 39-40.)

DE 71, Pl.'s Mots. in Limine at 4-5 (citing TCPA).)  The TCPA states that "[i]t shall be unlawful" for a person to "send, to a telephone facsimile machine, an unsolicited advertisement."  47 U.S.C. § 227(b)(1)(C).  Courts, including the high courts of two states, have construed this language to conclude that a plaintiff need only prove a defendant sent a fax advertisement, not that the plaintiff received it, to establish a violation of the TCPA.  *See Hinman v. M & M Rental Ctr.*, 596 F. Supp. 2d 1152, 1159 (N.D. Ill. 2009); *A Fast Sign Co. v. Am. Home Servs., Inc.*, 734 S.E.2d 31, 33 (Ga. 2012); *Critchfield Physical Therapy v. Taranto Grp., Inc.*, 263 P.3d 767, 778-79 (Kan. 2011).  None of these courts addressed the question in the context of Article III case-or-controversy standing.

In conjunction with its prohibition on sending an unsolicited fax advertisement, the TCPA also contemplates that the fax advertisement have a "recipient."  In the prohibition provision alone, the statute states that it is unlawful to send a fax advertisement "if the *recipient* is in the United States" and goes on to mention the "recipient" five more times.  *See* 47 U.S.C. § 227(b)(1)(C) (emphasis added).  In so doing, Congress recognized that only a recipient could suffer the injury the TCPA was intended to address.

While the TCPA provides that a person who sends a fax advertisement may be liable, nowhere in the statute does Congress express an intent to circumvent the requirement that a plaintiff have Article III case-or-controversy standing to bring a claim, which requires that the plaintiff demonstrate "a distinct and palpable injury to himself." *See Warth v. Seldin*, 422 U.S. 490, 501 (1975).  Congress can enact a statute (such as the TCPA) that puts into place a "bounty"—a reward—for a plaintiff who assists in

enforcing federal laws. *See Crabill v. Trans Union, LLC*, 259 F.3d 662, 665-66 (7th Cir. 2001). However, there still must be an injury for the plaintiff to recover under the statute. *See id.*

In *US Fax Law Center, Inc. v. iHire, Inc.*, the court addressed whether a plaintiff who never received the "junk faxes" at issue had standing to bring TCPA claims against the defendants who allegedly sent the faxes. 362 F. Supp. 2d 1248, 1252-53 (D. Colo. 2005). There, the plaintiff was an assignee of the TCPA claims of certain entities contending that the defendants had sent "junk faxes." *Id.* at 1250. Examining the question of Article III case-or-controversy standing *sua sponte*, the court concluded that the plaintiff did not suffer an injury in fact sufficient to give it standing to bring the TCPA claims; in fact, plaintiff "suffered no injury at all." *Id.* at 1253; *cf. Doe v. Nat'l Bd. of Med. Exam'rs*, 199 F.3d 146, 153 (3d Cir. 1999) (noting that a violation of a statute by itself does not equate to injury and that "[t]he proper analysis on standing focuses on whether the plaintiff suffered an actual injury, not on whether a statute was violated"). Thus, pursuant to the TCPA, Congress conferred a private remedy upon the ***injured recipients*** of a fax advertisement, not upon assignees of the alleged recipients.

Several other aspects of the TCPA also inform the Court's analysis of a plaintiff's standing to bring a claim under the statute. First, the TCPA's prohibition on sending faxes is content-specific. Congress did not ban any unsolicited fax from being sent, just fax advertisements. 47 U.S.C. § 227(b)(1)(C). Presumably, a plaintiff must see a fax to discern whether it is an advertisement or not. Furthermore, it is well-settled that, in enacting the TCPA, the aim of Congress was to protect consumers' privacy rights. *See Dish Network*, 28 FCC Rcd. at 6575, 6585 (citing TCPA); *US Law Center*, 362 F. Supp.

27

2d at 1251. If a plaintiff does not see, know about, or otherwise become aware of an unsolicited fax advertisement, it is difficult to conceive how the plaintiff's right to privacy could be invaded by the fax advertisement such that the plaintiff is injured in fact.

### b.    Insufficiency of Evidence

Against this statutory backdrop, Plaintiff does not proffer sufficient evidence to demonstrate it suffered a distinct and palpable injury to itself such that it has standing to bring a TCPA claim against Defendant. The only evidence in this case that a fax was ever sent or received is the Bigerstaff report, which states only that a one-page fax (of unknown content) was sent through an electronic handshake. Plaintiff's own evidence shows that Sugarman had no knowledge of receiving the fax in question, never saw it, and cannot identify any records or employees that could establish receipt of the fax. (Sugarman Dep. at 19-22, 28, 64.) There is also no evidence that the fax ever printed, tied up Plaintiff's dedicated fax line, or caused any other possible injury.[21] Any claim by Plaintiff that such an injury could have occurred is merely hypothetical, which is insufficient to withstand the standing inquiry.

There is no dispute that counsel for Plaintiff, armed with the Bigerstaff report, solicited Plaintiff to bring this action against Defendant. Indeed, Plaintiff had no knowledge of the fax in question at the time the lawsuit was initiated, was not aware of the details of the lawsuit, and does not remember reviewing the complaint before it was filed. (*See* Sugarman Dep. at 25-28.) Counsel for Plaintiff has repeatedly represented

---

[21]    To the extent Sugarman testified (inconsistently) regarding the number of faxes Plaintiff may have received in total from any sender, there is no causal connection between Defendant and Plaintiff's receipt of those unidentified faxes. (*See* Sugarman Dep. in *ADCAHB* at 49-50; Sugarman Dep. at 68-69.)

to the Court that it is proving its case solely through the Bigerstaff report and not through Plaintiff. [22] (*See, e.g.*, Hr'g Tr. at 21.)

However, to have Article III case-or-controversy standing to bring its TCPA claim, Plaintiff must have suffered a distinct and palpable injury. At this, the summary judgment stage, Plaintiff must have adduced enough evidence (and not merely allegations) for the Court to conclude that Plaintiff was injured in fact. There is no evidence that this Plaintiff was injured by receiving a fax advertisement from Defendant or that this Plaintiff's privacy was ever invaded by Defendant, as the TCPA contemplates. Accordingly, the Court lacks subject matter jurisdiction over Plaintiff's TCPA claim, and the claim must be dismissed.

---

[22] Earlier in this Order, the Court quoted the contents of the solicitation letter sent by Plaintiff's counsel to Plaintiff. (*See* DE 28-16 at 10 (produced by Plaintiff in its responses to Defendant's requests for production).) The Court finds that this letter (notwithstanding its self-serving "advertisement" label) most likely violated Florida's attorney ethics rules, including Professional Ethics of the Florida Bar Opinion 71-22, which provides that a lawyer's contact with a putative member of a class shall not seek to have such person employ the original attorney in the litigation. In other words, a lawyer may not seek clients by sending solicitation letters to putative members of a class. A Florida state court examined a similar question in another case and found that, under those facts, since Plaintiff's counsel did not have a regular or permanent presence in Florida for the practice of law in the spring of 2009, when Plaintiff's counsel sent the solicitation letter, the Florida rules did not apply. (DE 38-1, Order, *Sabon, Inc. v. Aqualogic, Inc.*, No. 09-037436, at 7 (Fla. Cir. Ct. Nov. 30, 2012).) That court also noted that Plaintiff's counsel became licensed to practice law in Florida shortly thereafter. (*Id.*) Other courts have expressed similar ethical concerns with the solicitation letters sent by Plaintiff's counsel, although they have concluded that the concerns in those cases did not warrant a denial of class certification. *See, e.g.*, *Reliable Money Order*, 704 F.3d at 492-93, 500-01. Here, the Court cannot determine when Plaintiff's counsel sent the solicitation letter that led to this lawsuit—or whether Plaintiff's counsel had a regular or permanent presence in Florida for the practice of law at that time—because Plaintiff's counsel destroyed its records regarding the sending of solicitation letters. However, if Plaintiff's counsel was *not* licensed in Florida when it sent the solicitation letters, the letters most likely constituted the unlicensed practice of law. *See* Gould v. Harkness, 470 F. Supp. 2d 1357, 1359 (S.D. Fla. 2006) ("The Florida Supreme Court has held that solicitation and advertising within Florida by a lawyer admitted in another jurisdiction constitutes an unlicensed practice of law." (citation omitted)).

## B. The Conversion Claim

In Count II of the complaint, Plaintiff alleges that Defendant's broadcast of a one-page fax converted Plaintiff's fax machine, toner, paper, and employee time to Defendant's own use, giving rise to a common law conversion claim. (SAC ¶¶ 14, 38.) Under Florida law, "[c]onversion is an 'act of dominion wrongfully asserted over another's property inconsistent with his ownership therein.'" *Warshall v. Price*, 629 So. 2d 903, 904 (Fla. 4th DCA 1993) (quoting 12 Fla. Jur. 2d *Conversion and Replevin* § 1 (1979)). In its Motion, Defendant argues that it is entitled to summary judgment on Plaintiff's conversion claim because it never held Plaintiff's fax machine and thus never exercised dominion or control over it, and that, in any case, the damages associated with the alleged conversion are *de minimis*. (MSJ at 14-16; Reply to MSJ at 10.)

Plaintiff's conversion claim fails for at least four reasons, each of which is independently sufficient for the Court to grant summary judgment in Defendant's favor. First, Plaintiff once again fails to plead vicarious liability, this time for its conversion claim. Under Florida law, traditional agency principles apply to determine whether a defendant is vicariously liable for an act of conversion by a third party. *See Horizon Leasing, A Div. of Horizon Fin., F.A. v. Leefmans*, 568 So. 2d 73, 75 (Fla. 4th DCA 1990). However, as discussed above, a claim of vicarious liability for a tort must be pled in the complaint. *See Prager*, 2010 WL 2950065, at *9. It is undisputed—indeed, Plaintiff concedes—that Defendant did not transmit the fax forming the basis of Plaintiff's conversion claim; B2B did. However, in the complaint, Plaintiff alleges only that Defendant sent a fax that converted Plaintiff's fax machine. As alleged, Plaintiff's claim cannot be supported by the undisputed facts, and Defendant is entitled to

30

summary judgment on the conversion claim.[23]  *See Schaffer*, 74 F.3d at 731; *Computer Aid*, 56 F. Supp. 2d at 537-38.

Second, aside from the pleading defect, Plaintiff in its briefing makes no argument that some theory of vicarious liability should apply to make Defendant liable for conversion resulting from B2B's alleged actions, let alone point to any facts supporting that claim.   Plaintiff thus fails to meet its evidentiary burden on the conversion claim, and summary judgment for Defendant is appropriate.  *See Brooks*, 116 F.3d at 1370 (citing *Celotex*, 477 U.S. at 322-23); *Ryan*, 794 F.2d at 647.

Third, the fact that Plaintiff has no knowledge of ever receiving a fax from Defendant and can produce no evidence that a fax was ever printed precludes Plaintiff's conversion claim.  In other words, if no fax was printed by Plaintiff's fax machine, none of Plaintiff's toner, paper or employee time could have been converted.  *Cf. Rossario's Fine Jewelry, Inc. v. Paddock Publ'ns, Inc.*, 443 F. Supp. 2d 976, 980 (N.D. Ill. 2006) (dismissing plaintiff's conversion claim and noting that "it would impermissibly warp the concept of 'conversion' if that label were to be attached to [plaintiff's] property (ink, toner, paper) that never came into [defendant's] possession at all" and that the Court "could well charge [plaintiff] and its counsel with 'conversion' for the Court's having had to waste paper and ink in the just-completed analysis").  Without any such evidence, Plaintiff cannot sustain its conversion claim.

Finally, in response to Defendant's contention that the value of any converted property arising from the receipt of a one-page fax would be *de minimis*, Plaintiff cites

---

[23]     To the extent Plaintiff uses any inconsistencies in TCPA law as an excuse not to have pled vicarious liability in the TCPA context, that excuse is unavailable with respect to Plaintiff's conversion claim.

Florida law for the principle that conversion "is an appropriate cause of action even if the specific property 'converted' has no actual value." (Resp. to MSJ at 18 (quoting *Warshall*, 629 So. 2d at 904).) Not only does Plaintiff misconstrue that holding, but the facts of this case differ markedly from those in *Warshall*. At issue in *Warshall* was the alleged conversion of a doctor's patient list. 629 So. 2d at 904. There, the court concluded that, while the paper the list was printed on had virtually no value, the contents of the list did, albeit in intangible form. *Id.* at 904-05. By contrast, in the present case, the paper and ink allegedly converted in the printing of a one-page fax had no underlying, intangible value, and the parties are in agreement that the value of the paper and ink was minimal.[24] *Warshall* does not stand for the proposition that a plaintiff can ultimately recover for property converted that has virtually no tangible or intangible value. This Court is in accord with the numerous courts that have held that the alleged conversion resulting from the printing of a one-page fax is *de minimis*, and the conversion claim therefore fails. *See G.M. Sign, Inc. v. Elm St. Chiropractic, Ltd.,* 871 F. Supp. 2d 763, 767-69 (N.D. Ill. 2012) (applying Illinois law and collecting cases to conclude that, "[i]f the conversion was *de minimis*—resulting in damages that are minuscule, and mere inconveniences—then the conversion claim must fail"). For all of these reasons, Defendant is entitled to summary judgment on Plaintiff's conversion claim.

---

[24]     Sugarman testified that the value of the paper and ink used to print a one-page fax would be "pennies." (Sugarman Dep. at 45.)

## III.    CONCLUSION

As the Court stated at oral argument, both Plaintiff's TCPA claim and its conversion claim are rife with fatal pleading and evidentiary defects such that they may not proceed to a jury. (Hrg. Tr. at 39.)  Moreover, under the facts of this case, the Court lacks subject matter jurisdiction over Plaintiff's TCPA claim because Plaintiff cannot demonstrate that it suffered injury in fact sufficient to give it Article III case-or-controversy standing before this Court.

Accordingly, for all the reasons set forth above, it is hereby **ORDERED AND ADJUDGED** that Defendant's Motion for Summary Judgment (DE 59) is **GRANTED**. Any and all other pending motions in this matter, including Defendant's Motion to Strike Portions of Plaintiff's Response to Defendant's Motion for Summary Judgment (DE 80), are **DENIED AS MOOT**.  The Clerk is directed to **CLOSE** this case for administrative purposes.

**DONE AND ORDERED** in chambers at Miami, Florida this 21 day of October, 2013.

KATHLEEN M. WILLIAMS
UNITED STATES DISTRICT JUDGE