IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

CITY SELECT AUTO SALES, INC.,
          Plaintiff,

     v.

DAVID RANDALL ASSOCIATES,
INC., et al.,

                    Defendants.

Civil Action
No. 11-2658 (JBS-KMW)

**OPINION**

APPEARANCES:

Alan C. Milstein, Esq.
Sherman, Silverstein, Kohl, Rose & Podolsky, PC
Eastgate Corporate Center
30 Harper Drive
Suite 200
Moorestown, NJ 08057
     -and-
Tod Lewis, Esq.
Jonathan Piper, Esq.
Bock & Hatch, LLC
134 N. La Salle St., Ste. 1000
Chicago, IL 60602
     Attorneys for Plaintiff City Select Auto Sales, Inc.

F. Emmett Fitzpatrick, III, Esq.
Flamm Boroff & Bacine PC
794 Penllyn Pike
Blue Bell, PA 19422
     Attorney for Defendants and Third Party Plaintiffs David
     Randall Associates, Inc. and Raymond Miley, III

**SIMANDLE,** Chief Judge:

<u>TABLE OF CONTENTS</u>

I.   INTRODUCTION.............................................. 2
II.  BACKGROUND................................................ 3
  A.  David Randall's Advertising Campaign ................... 3
  B.  The Named Plaintiff .................................... 4

   C.   Plaintiff's Counsel's Behavior .......................... 7
   D.   Prior Litigation Against David Randall ................. 11
   E.   Procedural History ..................................... 12
III. CLASS CERTIFICATION MOTION.............................. 15
   A.   Parties' Arguments ..................................... 15
   B.   Article III Standing ................................... 18
   C.   Discovery Issues ....................................... 23
   D.   Federal Class Certification Law Governs ................ 26
   E.   Class Certification Standard ........................... 30
   F.   Plaintiff's Class Certification Motion Will be Granted . 31
      1.   Satisfaction of F.R.C.P. 23 .......................... 31
      2.   Suitability of Class Representative .................. 38
      3.   Admissibility of Hard Drive Evidence ................. 44
      4.   Suitability of Class Counsel ........................ 45
      5.   Proposed Class Definition ........................... 56
      6.   Settlement Pressure ................................. 60
      7.   Common Questions of Law and Fact .................... 61
      8.   Requirement of Notice to Class ...................... 61
IV.  CONCLUSION.............................................. 62

   I.   **INTRODUCTION**

      This action is a putative class action brought under the
Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227, on
behalf of persons who received unsolicited fax advertisements
from Defendant David Randall Associates, Inc. ("David Randall")
and its owner Defendant Raymond Miley, III, (hereafter
"Defendants") in the spring of 2006. The TCPA imposes on anyone
who sends an unsolicited fax advertisement statutory damages of

$500 per fax, which can be trebled if the violation was willful or knowing. 47 U.S.C. § 227(b)(1)(C), (b)(3)(B).

Before the Court is the renewed motion for class certification pursuant to Rule 23(b)(3), Fed. R. Civ. P., by Plaintiff City Select Auto Sales, Inc. ("City Select") [Docket Item 60], which incorporates Plaintiff's original motion for class certification [Docket Item 30]. The principal issues are whether Plaintiff's counsel has behaved unethically such that they are inadequate class counsel and whether Plaintiff is an adequate class representative. The Court holds that Plaintiff's counsel will represent the class loyally and Plaintiff is an adequate representative. Plaintiff's motion will be granted.[1]

## II.  BACKGROUND

### A. David Randall's Advertising Campaign

Defendant David Randall, which is owned by Defendant Raymond Miley III, is a Pennsylvania-based commercial roofing contractor. David Randall contracted with Business to Business Solutions ("B2B"), a fax advertising company, to send advertisements on rainy days to persons and entities located in zip codes within a specific geographic area. B2B was owned by Caroline Abraham and was operated by Caroline Abraham and her

---

[1] Both parties filed motions for leave to cite supplemental authority [Docket Items 86 & 92], which will be granted.

son, Joel Abraham, who are not named as direct defendants. Defendants did not contact the prospective recipients to request permission to send advertisements. On March 29, April 4, April 13, April 14, May 15, and May 16, 2006, B2B sent fax advertisements on Defendants' behalf. (Pl. 1st Class Certification Br. ("Pl. 1st Br.") at 1.) The advertisements described David Randall Associates, provided its phone number, and stated "Roof Leaks??? Repairs Available." [Docket Item 30-3 at 15.]

Plaintiff's expert witness examined a B2B hard drive furnished to Plaintiff's counsel by the Abrahams (discussed further below) and found that Defendants' advertisements were successfully sent 44,382 times to 29,113 unique fax numbers. (Pl. 1st Br. at 8.)

**B. The Named Plaintiff**

According to B2B's records, Plaintiff received faxes from David Randall on April 4 and May 15, 2006. (Pl. 1st Br. at 8.)

City Select's President Louis L. Pellegrini has a "pet peeve[]" against junk faxes. (Pellegrini Dep. [Docket Item 82-7] Feb. 28, 2013, 31:8.) He testified, "People that faxed me with – with transmissions that have nothing to do with me I resent because it costs me money in toner and paper . . . ." (<u>Id.</u>

50:12-15.) He also believes that junk faxes "effectively stole City Select Auto Sales' employees' times." (Id. 100:25-101:2.)

He had an arrangement with an attorney named Brian Wanca whereby Pellegrini would collect junk faxes "until the pile gets relatively large, and I can scan them and send them to Mr. Wanca." (Id. 50:17-19.) Pellegrini explained, "I get large numbers of faxes that . . . I never requested or have any business with, and Mr. Wanca told me that I should give them to him and he might bring lawsuits against those people . . . ." (Id. 30:4-6.)

He does not have any emails containing junk faxes that he sent Wanca because "every six months or so, whenever I get an email from my server that says I'm at 99.5% of capacity for emails, I go into my email and I delete all the sents as well as all those that just are ones that come to me . . . ." (Id. 51:17-22.)

He does not presently have any information about, recollection of, or record of the faxes that he received from David Randall in 2006.

Pellegrini testified that he had purchased the fax machine that City Select used in 2006 and that City Select's current fax number was the same in 2006. (Pellegrini Dep. 81:23-85:14.)

At his deposition, Pellegrini expressed some confusion about the different attorneys with whom he had worked. He had communicated with Wanca; Jonathan Piper, who represented him at his deposition; and an attorney named Tod, who works with Piper. When asked at his deposition, "Who represents you?" He responded, "I haven't a clue. Mr. Pippen [sic] does." (Id. 56:14-16.) He did not recall whether he had signed a fee agreement with his attorneys, but he was certain that "I would not have agreed to pay an hourly rate, which I feel could get expensive, that I would have only agreed to a contingency basis." (Id. 64:22-25.) He was also uncertain about whether he had retained Wanca, stating, "I don't know the difference between agreeing to send faxes in which he would bring a lawsuit against people who sent you unlawful faxes and whether I retained Mr. Wanca. I don't know the difference between that." (Id. 95:21-96:2.) He also said, "I said that I had agreed to do business with Mr. Wanca. If that means that I retained counsel, then I guess I did." (Id. 98:5-7.)

Pellegrini did not recall reading the Complaint but, when presented with the document, said "this has the look of what I would have stored on my file." (Id. 73:21-23.) He said, "even if I had received this document, I would have read the first part here, the first page that says that I'm suing the guy for the

faxes, and I wouldn't have gotten past the first page" because "it's a waste of my time." (Id. 73:24-74:9.)

He did not recall, at his deposition, whether he had discussed other class members with anyone before the Complaint was filed. He had never discussed City Select's role in the litigation. He did not know how much remuneration City Select might receive from the litigation. He also did not know how much remuneration his attorneys might receive.

**C. Plaintiff's Counsel's Behavior**

This action is based on a B2B hard drive cataloguing fax advertisement campaigns that B2B conducted on behalf of clients, including David Randall. Ryan Kelly, an attorney from the Illinois firm Anderson & Wanca, obtained the hard drive. Kelly, Brian Wanca, and other Anderson & Wanca attorneys wanted to obtain the hard drive to retrieve the data themselves at their own expense. (Wanca Dep. 158:13-24.) In support of its class certification motion, Plaintiff submitted an affidavit from Caroline Abraham, B2B's owner and operator, dated December 28, 2010, describing B2B's operations and her son Joel's production of the hard drive. [Docket Item 30-5.]

Defendants assert that Kelly promised Caroline Abraham that he would keep the hard drive contents confidential and that he

would ensure Abraham would not be sued.[2] Plaintiff argues that Kelly obtained the hard drive from Caroline Abraham's son Joel Abraham and that Joel Abraham produced the hard drive at a deposition, pursuant to a subpoena, while represented by an attorney, and without any confidentiality promise.

Brian Wanca testified that Caroline Abraham "advised [Anderson & Wanca] that she wanted to be paid for her time to meet with us, or to sit for deposition, or to produce records . . . ." (Wanca Dep. (Docket Item 82-8) 109:13-16.) For example, on August 4, 2008, she stated, "[w]e would greatly appreciate a very modest payment of $1,250 for our services." (Def. 1st Opp'n Ex. J.) Brian Wanca wrote many checks to Carolina Abraham for witness fees, mileage, and transportation costs. (Wanca Dep. 114-117.)  By August 2009, Anderson & Wanca had paid the Abrahams over $3,500 for their time and expenses in responding to multiple requests for information. (Pl. 2nd Class Certification Br. at 13.)

---

[2] In support of this assertion, Defendants cite an email from David Paul, an attorney at Leader & Berkon, regarding a different case involving the B2B hard drive data in which Paul told Abraham, "One of the other parties . . . tried to include you as a defendant in that action. We challenged that motion and . . . we successfully defeated it. As a result, you are not sued in that case, nor will you ever be." (Def. 1st Opp'n Ex. L.) Defendants allege that Paul and Kelly were working together.

Ryan Kelly told Brian Wanca that the Abrahams were requesting $5,000 to compensate them for their time and expenses. (Wanca Dep. 184:20-185:22.) Brian Wanca wrote a $5,000 check to Abraham's attorney Eric Rubin on August 10, 2009. (Def. 1st Opp'n Ex. I.) In the memo line, the check states, "document retrieval." (Id.) Wanca anticipated that Joel Abraham and Caroline Abraham would spend a considerable amount of time in the future responding to document requests and sitting for sworn statements/depositions. (Wanca Dep. 180:4-11.) Wanca calculated the $5,000 figure because "[a]t that time, there was more than 10 cases and less than 50 cases that we had – or in the process – of filing in which the Abrahams were the facts [sic] broadcaster. Between document retrieval, . . . Joel and Carol sitting for deposition, there were a large number of cases . . . ." (Wanca Dep. 180:17-181:10.) Wanca "believe[d] the $5,000 figure to encompass $100 to retrieve documents and $100 for each of them to sit for upcoming depositions, that Mr. Rubin would put it in his trust account and pay . . . it out . . . since other checks . . . had gone through Rubin in the past." (Wanca Dep. 183:8-21.)

At that time, Wanca was leaving for a family vacation with his family to the Carolinas. (Wanca Dep. 190:3-14.) They stayed in a Ramada Inn, (Wanca Dep. 191:9-10), and Wanca mailed the

check to Rubin in a Ramada envelope, (Def. 1st Opp'n Ex. I).
Wanca "normally" takes blank checks with him when he travels "in
case the firm needs checks cut while – while I'm away." (Wanca
Dep. 190:24-191:4.)

Rubin voided the check and wrote a letter to Mr. Wanca
stating that Caroline Abraham was unwilling to accept funds from
Wanca's firm. Rubin stated, "I regard this attempt to pay my
client for their cooperation in providing you with information
or documents identifying third parties that may have sent fax
transmissions through Business to Business at the very least, to
be of questionable propriety." (Def. Opp'n Ex. I.) When he
received Rubin's letter, Wanca faxed Rubin a note apologizing
for the misunderstanding. (Wanca Dep. 196:13-197:18.) Wanca
testified that he had "understood that there was an agreement
whereby [Rubin] would receive $5,000 and then disburse it as
needed in – in the cases that we – that we had some discussions
with him about. Apparently, him and Mr. Kelly did not reach the
specifics of the discussion . . . ." (Wanca Dep. 198:9-18.)

Wanca testified that "[n]o complaints have been brought
against me or Mr. Kelly in any jurisdiction . . . ." (Wanca Dep.
217:19-21.)

On December 5, 2009, Wanca sent a letter to City Select
Auto Sales soliciting its participation in junk fax litigation.

10

The letter stated, "My law firm pursues class action lawsuits against companies that send junk faxes . . . we have determined that you are likely to be a class member in one or more cases that we are pursuing. You might not remember receiving the junk faxes, but if the lawsuit were successful, you would receive compensation (from $500 up to $1,500) for each junk fax sent to you." [Docket Item 36-1 at 70.] The bottom of the letter stated, "Advertising Material." [Id.]

**D. Prior Litigation Against David Randall**

Anderson & Wanca, often working in coordination with other law firms, filed "more than 50 similar class action suits based on information from Abraham's records concerning firms that used her faxing services and the recipients of the faxes." Creative Montessori Learning Centers v. Ashford Gear LLC, 662 F.3d 913, 916-17 (7th Cir. 2011).

In one such case, plaintiff G. Winter's Sailing Center, Inc. ("Winter's") filed suit against David Randall in New Jersey Superior Court complaining of the same faxes underlying this action.

Kelly had sent Winter's a letter stating, "You might not remember receiving the junk faxes, but if the lawsuit were successful, you would receive compensation (from $500 up to $1,500) for each junk fax . . . ." [Docket Item 31-2 at 13.] In

11

a subsequent email to Winter's, Kelly wrote, "Your company received the attached three junk faxes. Please sign and return the Retainer Agreements . . . ." [Docket Item 31-2 at 16.]

In the Winter's litigation, Alan Milstein, who was plaintiff's counsel in that action and is Plaintiff's counsel in the present action, filed a motion to admit Kelly as pro hac vice co-counsel. Defendants argued that motion was an attempt to insulate Kelly from a deposition. The Winter's court denied the pro hac vice motion and permitted Defendants' counsel to depose Kelly. After Defendants' counsel obtained a subpoena to depose Kelly, Winter's "abruptly accepted a $1,500 judgment . . . ." (Def. 1st Opp'n at 3.) The Winter's action against David Randall closed. No class had been certified, and the settlement was only on Winter's behalf.

Plaintiff's attorneys then filed the present action on behalf of City Select individually and as the representative of a class of similarly situated persons.

**E. Procedural History**

Defendants filed a motion to dismiss [Docket Item 8], which the Court denied [Docket Items 17 & 18]. The Court's principal holdings were that "during at least the first fourteen months of the [Winter's] Superior Court action, . . . claims on behalf of unnamed alleged recipients of the unsolicited fax were tolled,"

the statute of limitations did not bar the present action, and the entire controversy doctrine was inapplicable. City Select Auto Sales, Inc. v. David Randall Associates, Inc., Civ. 11-2658 (JBS/KMW), 2012 WL 426267, at *5 (D.N.J. Feb. 7, 2012).

Defendants filed a Third Party Complaint against Caroline Abraham and Joel Abraham. [Docket Item 23.] The Abrahams never appeared, and Defendants filed a motion for default, [Docket Item 42]. Plaintiff filed a response [Docket Item 43] opposing entry of default. The Court granted the motion and the Clerk entered default against the Abrahams. [Docket Item 53.]

The Court heard oral argument on Plaintiff's first motion for class certification [Docket Item 30] and determined that the parties needed to conduct limited discovery and submit additional briefing. The Court issued an order [Docket Item 53] dismissing Plaintiff's first motion for class certification without prejudice. The Court permitted Plaintiff to file a renewed class certification motion and instructed Defendant to file its response within 60 days thereafter, thus allowing time for reasonable discovery, including depositions of Brian Wanca and Ryan Kelly, the attorneys who obtained the B2B hard drive, and Caroline Abraham, B2B's owner.

The Court also instructed the parties to brief the impact of 47 U.S.C. § 227(b)(3), which states that "[a] person or

entity may, if otherwise permitted by the laws or rules of court of a State, bring in an appropriate court of that State" TCPA actions. At oral argument on Plaintiff's first class certification motion, Defendant asserted that New Jersey law applied and precluded class certification.

During a teleconference regarding a discovery dispute, Plaintiff noted that the district court in <u>Bais Yaakov of Spring Valley v. Peterson's Nelnet, LLC</u>, Civ. No. 11-00011, 2013 WL 663301 (D.N.J. Feb. 21, 2013), had certified an interlocutory appeal regarding the impact of 47 U.S.C. § 227(b)(3). Both parties requested an indefinite stay pending the Third Circuit's resolution, and the Court stayed [Docket Item 72] the case. Plaintiff later filed a notice [Docket Item 73] that the Third Circuit declined to certify the interlocutory appeal. This Court issued an Order [Docket Item 74] lifting the stay and reactivating Plaintiff's motion for class certification.

Defendants filed a motion to compel the depositions of third-party Defendants Caroline Abraham and Joel Abraham. Magistrate Judge Karen M. Williams issued an Order noting that "Defendants' counsel unjustifiably refused to cooperate with third-party Defendants to find a mutually convenient time and place for their depositions." [Docket Item 84 at 4.] Magistrate Judge Williams granted in part and denied in part Defendants'

motion, holding that "third-party Defendant Caroline Abraham shall be deposed on a mutually agreed upon Sunday in Brooklyn, New York on or before September 30, 2013" and "that insofar as Defendants' counsel properly serves Joel Abraham with a deposition notice, he shall likewise be deposed in Brooklyn, New York . . . ." [Id. at 5.] In the end, Defendants' counsel did not depose either Caroline or Joel Abraham despite having the opportunity to do so.

The Court heard oral argument on Plaintiff's renewed motion for class certification on October 23, 2013. At this oral argument, the Court ordered Plaintiff to submit a copy of the retainer agreement, which was submitted via letter [Docket Item 88]. Defendant then filed three letters in response [Docket Items 89, 90, & 91], all of which have been considered.

## III.    CLASS CERTIFICATION MOTION

### A. Parties' Arguments

Plaintiff argues that federal class certification law governs. Plaintiff seeks to certify its TCPA claim under Fed. R. Civ. P. 23(b)(3) on behalf of the following class:

> All persons who were successfully sent one or more faxes during the period March 29, 2006, through May 16, 2006, stating, "ROOF LEAKS??? REPAIRS AVAILABLE Just give us a call and let our professional service technicians make the repairs!" and "CALL: David/Randall Associates, Inc. TODAY."

(Pl. 1st Class Cert. Mot. at 1.)

15

Plaintiff identifies five common questions: (1) whether Defendants' fax constitutes an advertisement, (2) whether Defendants violated the TCPA by sending the advertisements without permission, (3) whether Plaintiff and other class members are entitled to statutory damages, (4) whether Defendants' actions were willful and knowing under the TCPA and, if so, whether the Court should treble the statutory damages, and (5) whether the Court should enjoin Defendants from future TCPA violations. (Pl. 1st Br. at 13.)

Plaintiff asserts that all class members have common evidence, i.e., the B2B hard drive. Plaintiff argues that City Select is an adequate representative and that its attorneys are adequate class counsel.

Defendants argue that Ryan Kelly, Brian Wanca, and Plaintiff's counsel unethically obtained the hard drive from B2B by offering payment and free legal services, by falsely assuring the Abrahams that they would not be subject to legal processes, and by falsely promising confidentiality. Defendants argue that Plaintiff's counsel's efforts to defend the Abrahams from legal action are contrary to the interests of the proposed class. Defendants also argue that the affidavits and declarations that Plaintiff proffers to admit the hard drive evidence are invalid.

They assert that Brian Wanca unethically solicited Winter's and City Select to participate in litigation.

Defendants claim that Plaintiff's retainer agreement shows that Plaintiff's counsel are violating the Rules of Professional Conduct because the attorneys who signed the retainer agreement, Brian Wanca and Phillip Bock, are not licensed to practice law in New Jersey and are not admitted pro hac vice. In addition, the fee agreement contains a provision in which the client agrees not to oppose the attorneys' effort to seek 1/3 of any award, if the action succeeds, and Defendants argue that this provision is improper.

Defendants also argue that Plaintiff's counsel's responses to discovery questions in the Winter's litigation were false and unethical and that Wanca and Kelly wrongfully claimed attorney-client privilege in response to certain questions at their depositions.

Defendants claim that City Select is an inadequate named Plaintiff because its President and representative, Louis Pellegrini, was unaware of many aspects of this litigation process and could not recall receiving the faxes from David Randall.

Defendants also argue that the TCPA only permits class certification if state laws permit it, and New Jersey law prohibits class certification in TCPA cases.

Finally, Defendants challenge Plaintiff's proposed class definition because it does not specify that the fax transmissions must have been unsolicited and received and does not exclude recipients who had an established business relationship with David Randall.

**B. Article III Standing**

At the threshold, the Court addresses Defendants' argument that City Select lacks standing because its representative, Pellegrini, does not recall receiving the fax advertisements.

"Article III standing is a necessary prerequisite to class certification." P.V. ex rel. Valentin v. Sch. Dist. of Philadelphia, 289 F.R.D. 227, 231 (E.D. Pa. 2013). "Named plaintiffs must have case or controversy standing." In re Flonase Antitrust Litig., 692 F. Supp. 2d 524, 534 (E.D. Pa. 2010). The three "irreducible" constitutional elements of standing are: (1) an injury in fact that is actual, not "conjectural" or "hypothetical"; (2) a causal connection between the injury and the conduct complained of; and (3) a showing that it is likely that a favorable decision will redress the injury. Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992).

18

Only the first element is disputed here. Defendants cite
Palm Beach Golf Ctr.-Boca, Inc. v. Sarris, Civ. 12-80178, 2013
WL 5972173 (S.D. Fla. Oct. 22, 2013), in which the district
court granted summary judgment to the defendant because, inter
alia, the plaintiff lacked Article III standing. Palm Beach Golf
also involved B2B fax transmissions although the defendant had
hired an independent marketing contractor who retained B2B
without the defendant's knowledge. The plaintiff, Palm Beach
Golf, did not know it had received a fax from the defendant's
company and did not know the fax's contents. The Palm Beach Golf
court held that "only a recipient could suffer the injury the
TCPA was intended to address" and that "Congress conferred a
private remedy upon the *injured recipients* of a fax
advertisement." Id. at *12 (emphasis in original). The Palm
Beach Golf court further explained that "[i]f a plaintiff does
not see, know about, or otherwise become aware of an unsolicited
fax advertisement, it is difficult to conceive how the
plaintiff's right to privacy could be invaded by the fax
advertisement such that the plaintiff is injured in fact." Id.
at *13. In addition, Palm Beach Golf found that "[t]here is also
no evidence that the fax ever printed, tied up Plaintiff's
dedicated fax line, or caused any other possible injury. Any
claim by Plaintiff that such an injury could have occurred is

19

merely hypothetical, which is insufficient to withstand the standing inquiry." Id. at *13.

Palm Beach Golf does not bind this Court and the Court is not persuaded by its reasoning. Plaintiff has produced evidence that the fax advertisements were successfully sent, and the B2B evidence is sufficient for standing purposes. The TCPA "does not specifically require proof of receipt." CE Design Ltd. v. Cy's Crabhouse N., Inc., 259 F.R.D. 135, 142 (N.D. Ill. 2009). Plaintiff "has provided circumstantial proof of receipt by all of the numbers to which the fax logs indicate faxes were successfully sent on behalf of [David Randall]. That is sufficient . . . ." Id. at 142; see also Hinman v. M & M Rental Ctr., Inc., 596 F. Supp. 2d 1152, 1159 (N.D. Ill. 2009) ("On its face, the statute prohibit[s] the sending of unsolicited fax advertisements and make[s] no reference at all to receipt, much less to printing"). In addition, "[e]ven assuming the TCPA requires proof of receipt as opposed to merely transmission, Defendants fail to support the argument that a plaintiff may only establish receipt by producing the actual fax itself. Indeed, Plaintiff has produced circumstantial evidence of receipt through the fax logs." Savanna Grp., Inc. v. Trynex, Inc., Civ. 10-7995, 2013 WL 66181, at *5 (N.D. Ill. Jan. 4, 2013).

20

Moreover, Plaintiff's expert's report describes the five phases of fax transmission and explains that "[b]ecause a record of a successful transmission . . . reflects the successful completion of all 5 phases . . ., a record of a successful transmission . . . is a record that such transmission was sent to and received by 'equipment which has the capacity to transcribe text or images (or both) from an electronic signal received over a telephone line onto paper.'" (Biggerstaff Expert Report (Docket Item 30-4) ¶ 35.) Even if a fax was not actually printed, the Biggerstaff report shows that a successfully sent fax message was received by the recipient's machine. The B2B records from David Randall's fax campaign show error messages, such as "No carrier detected," "Busy signal detected," "Unknown problem (check modem power)" for some fax numbers. [Docket Item 30-4 at 26.] Plaintiff's proposed class only includes the 29,113 unique fax numbers that received "successful transmissions" and excludes the numbers to which the advertisement was not successfully sent. [Docket Item 30-4 at 57.] Defendants have not adduced any evidence contradicting Plaintiff's expert's report and its explanation that "successfully sent" means that the recipient's machine successfully received the fax. The Court finds that the B2B transmission reports for the faxes at issue are sufficiently reliable that they can be used to identify

21

those fax machines to which the advertisements were successfully sent as part of the fax campaigns. That Plaintiff's machine is on the listing of successful transmissions is strong evidence Plaintiff received, and thus was harmed by, the unsolicited faxes.

The Court is also not persuaded by <u>Palm Beach Golf</u>'s requirement that the plaintiff must attribute a specific injury, such as an unavailable fax line, to the unsolicited fax advertisement. The TCPA prohibits sending unsolicited fax advertisements; it does not prohibit the sending of unsolicited fax advertisements only when there are specific harms that a plaintiff can later identify. As a general principle, "[a] plaintiff need not demonstrate that he or she suffered actual monetary damages because 'the actual or threatened injury required by Art. III may exist solely by virtue of statutes creating legal rights, the invasion of which creates standing.'" <u>Alston v. Countrywide Fin. Corp.</u>, 585 F.3d 753, 763 (3d Cir. 2009) (quoting <u>Havens Realty Corp. v. Coleman</u>, 455 U.S. 363, 373 (1982)). The Plaintiff need not prove that he consumed toner or paper to show that his TCPA rights were invaded.

In <u>Reliable Money Order, Inc. v. McKnight Sales Co., Inc.</u>, 281 F.R.D. 327, 331 (E.D. Wis. 2012), <u>aff'd</u>, 704 F.3d 489 (7th Cir. 2013), the defendant argued that the plaintiff lacked

standing because the plaintiff was "completely unaware of ever having allegedly received" a facsimile advertisement from the defendant. The McKnight Sales court rejected this argument and held that "the fact that Reliable Money does not personally recall receiving the 'junk fax' is inconsequential because personal knowledge of receipt is not necessary under the TCPA. I therefore find that Reliable Money has standing . . . ." Id. This Court agrees. "In enacting the TCPA, Congress chose to make evidence of *transmission* of the facsimile sufficient for Article III standing by the plain language of the statute." Bridgeview Health Care Ctr. Ltd. v. Clark, 09-5601, 2013 WL 1154206, at *3 (N.D. Ill. Mar. 19, 2013) (emphasis in original). Moreover, "the TCPA damages provision was not designed solely to compensate each private injury caused by unsolicited fax advertisements, but also to address and deter the overall public harm caused by such conduct." Texas v. Am. Blastfax, Inc., 121 F. Supp. 2d 1085, 1090 (W.D. Tex. 2000).

The B2B evidence sufficiently establishes that City Select has standing.

### C. Discovery Issues

At oral argument, Defendants' counsel argued that, if the Court declines to deny Plaintiff's motion, then the Court must order additional discovery because the Abrahams did not appear

23

for their depositions, Pellegrini did not bring documents to his deposition, and Wanca asserted attorney-client privilege in response to certain questions at his deposition. The Court will not order any further discovery before deciding the class certification motion.

Defendants emphasize that the Abrahams did not appear for their depositions, but Judge Williams issued an order noting that "Defendants' counsel unjustifiably refused to cooperate with third-party Defendants to find a mutually convenient time and place for their depositions." [Docket Item 84 at 4.] Judge Williams partially granted Defendants' motion to compel and ordered that "third-party Defendant Caroline Abraham shall be deposed on a mutually agreed upon Sunday in Brooklyn, New York on or before September 30, 2013" and "that insofar as Defendants' counsel properly serves Joel Abraham with a deposition notice, he shall likewise be deposed in Brooklyn, New York . . . ." [Id. at 5.] Defendants did not depose the Abrahams. The Court will not terminate the class certification motion again to allow discovery that Defendants could have previously taken.

In terms of Plaintiff Pellegrini's production of documents, Plaintiff's counsel appears to have produced the documents

requested by Defendants. At the deposition, Plaintiff's counsel said,

> I also want the record to be clear that we have
> produced . . . a December 5th, 2009 letter from Mr.
> Wanca to City Select, . . . copies of the faxes that
> were sent, and . . . logs of the phone numbers to
> which they were sent. So although the witness doesn't
> have those documents and didn't produce them today, I
> want the record to be clear that they have been
> provided.

(Pellegrini Dep. 128:24-129:13.) Defendants' counsel responded, "The record will reflect the fact that you're not a deponent and you're not under oath and none of that information is a matter of record." (Pellegrini Dep. 129:14-18.) Pellegrini's deposition occurred on February 28, 2013. If Defendants had not received the document production from Plaintiff's counsel, then they could have asked Plaintiff's counsel to resend the documents. If there were documents that Defendants sought and were not produced, Defendants could have conferred with Plaintiff's counsel and, if necessary, filed a discovery motion.

Brian Wanca was deposed on July 12, 2013. If there were concerns with his invocation of attorney-client privilege, Defendants could have contacted the Court or filed an appropriate motion. Defense counsel did not do so.

The Court had administratively terminated the class certification motion in December of 2012 to allow Defendants ample time to conduct discovery and that period was extended.

25

The time to raise discovery issues has long passed. The Court

will not grant Defendants' request to terminate the motion to

order more discovery.[3] "To further delay the class certification

determination would only serve to postpone indefinitely the

resolution of this dispute." Curley v. Cumberland Farms Dairy,

Inc., 728 F. Supp. 1123, 1128 (D.N.J. 1989).[4]

### D. Federal Class Certification Law Governs

Defendants argue that class certification is improper

because state law applies and New Jersey state law prohibits

class certification in TCPA cases. This argument lacks merit.

The TCPA provides that "[a] person or entity may, if

otherwise permitted by the laws or rules of court of a State,

bring in an appropriate court of that State" certain actions to

enjoin TCPA violations or to recover actual monetary loss. 47

U.S.C. § 227(b)(3). Defendant argues that this provision

requires the Court to apply New Jersey law to the class

certification question. The New Jersey Appellate Division has

---

3 Defendants will have the opportunity to obtain merits-based
discovery. While the Court finds that the parties have completed
ample discovery related to class certification issues, it does
not rule out more in-depth plenary discovery during the period
to be allotted in the future, if desired.
4 At oral argument, Defendants also argued that class
certification was inappropriate because of Plaintiff's alleged
discovery violations in the Winter's litigation. If there were
discovery violations in that case, Defendants should have raised
them before the New Jersey Superior court.

held that "a class action suit is not a superior means of adjudicating a TCPA suit." Local Baking Products, Inc. v. Kosher Bagel Munch, Inc., 421 N.J. Super. 268, 280 (App. Div. 2011).

Multiple federal courts have held that federal, not state, law applies to class certification in TCPA cases. The starting point for many of these decisions is Mims v. Arrow Fin. Servs., LLC, 132 S. Ct. 740, 751 (2012), in which the Supreme Court assessed the TCPA and stated:

> We are not persuaded, moreover, that Congress sought only to fill a gap in the States' enforcement capabilities. Had Congress so limited its sights, it could have passed a statute providing that out-of-state telemarketing calls directed into a State would be subject to the laws of the receiving State. Congress did not enact such a law. Instead, it enacted detailed, uniform, federal substantive prescriptions and provided for a regulatory regime administered by a federal agency.

In Mims, the Supreme Court held that the TCPA provides for federal causes of action. In other words, as Judge Hayden found, "federal courts remain available as separate and independent fora for plaintiffs to vindicate their rights under this federal law [TCPA]." Landsman & Funk, P.C. v. Skinder-Strauss Associates, Civ. 08-3610 KSH, 2012 WL 6622120, at *6 (D.N.J. Dec. 19, 2012). And "a federal court addressing a federal law that serves an important federal interest would be remiss were it to hold that a plaintiff's claim must be dismissed because of

a state law." Id. It follows that § 227(b)(3) recognized a concurrent jurisdiction for TCPA cases in the state court only as permitted by state laws or rules, without purporting to limit TCPA cases in federal court.

Several other courts post-Mims have concluded that federal law governs in federal TCPA actions, particularly on the class certification question. See, e.g., A & L Indus., Inc. v. P. Cipollini, Inc., Civ. 12-07598, 2013 WL 5503303, at *5 (D.N.J. Oct. 2, 2013) (rejecting Local Baking Products and holding that "the facts and issues at the core of the instant TCPA claim are better off resolved in a single class action than in numerous individual ones"); Bais Yaakov of Spring Valley v. Peterson's Nelnet, LLC, Civ. 11-00011, 2012 WL 4903269, at *7 (D.N.J. Oct. 17, 2012) ("In light of Mims, . . . this Court does not believe it appropriate to interpret the text of § 227(b)(3) as requiring a federal court to follow state law."); Bank v. Spark Energy Holdings, LLC, Civ. 11-4082, 2012 WL 4097749, at *2 (S.D. Tex. Sept. 13, 2012) ("federal law permits plaintiffs to bring TCPA claims as class action"); Jackson's Five Star Catering, Inc. v. Beason, Civ. 10-10010, 2012 WL 3205526, at *4 (E.D. Mich. July 26, 2012) ("Section 227(b)(3) . . . does not speak to actions brought in the federal courts and does not require that state substantive law and procedural rules be imported into federal

actions"); Bailey v. Domino's Pizza, LLC, 867 F.Supp.2d 835, 841
(E.D. La. 2012) ("Section 227(b)(3) applies to TCPA claims
brought in state court but by its plain language does not reach
a TCPA claim brought in federal court . . .").

Defendant argues that interpreting § 227(b)(3) to permit
this action to proceed as a class action violates statutory
construction rules and ignores the TCPA's plain text. This
argument is unpersuasive because "the interpretation . . .
supported by Mims does not require courts to overlook the
statutory text. To the contrary, . . . it requires courts to
read the statute literally and to recognize that the restrictive
language applies to actions brought in courts of a state."
Landsman & Funk, 2012 WL 6622120 at *8. Furthermore, the
Landsman & Funk court found that "there is support for the
principle that where it is necessary to overlook statutory
language in order to apply the Supreme Court's interpretational
guidance, lower courts must do so." Id. (citing United States v.
Taylor, 686 F.3d 182, 193 (3d Cir. 2012), for proposition that
"specific, on-point Supreme Court cases . . . take precedence
over that broad, generally applicable canon of statutory
interpretation").

Defendant also cites Bonime v. Avaya, Inc., 547 F.3d 497
(2d Cir. 2008), and Holster v. Gatco, Inc., 618 F.3d 214 (2d

Cir. 2010), which hold that §227(b)(3) permits TCPA actions in federal court only if state law would permit such actions. But, in Giovanniello v. ALM Media, LLC, 726 F.3d 106, 111 (2d Cir. 2013), the Second Circuit held "Mims fundamentally shift[ed] the way that we view section 227(b)(3)'s 'if otherwise permitted' language . . . ." The Giovanniello court concluded that "Mims's holding thus suggests that section 227(b)(3)'s state-oriented language applies only to TCPA claims in state court, not the universe of TCPA claims. We therefore hold that Mims . . . undermines the holdings of . . . Bonime, and Holster . . . ." Id. at 113. Thus, Bonime and Holster are no longer valid in the Second Circuit on this issue.

Federal, not New Jersey state, law applies to the class certification question presently before the Court.

**E. Class Certification Standard**

The party seeking class certification must establish:

(1) the class is so numerous that joinder of all members is impracticable [numerosity]; (2) there are questions of law or fact common to the class [commonality]; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class [typicality]; and (4) the representative parties will fairly and adequately protect the interests of the class [adequacy].

In re Hydrogen Peroxide Antitrust Litig., 552 F.3d 305, 309 n.6 (3d Cir. 2008) (citing Fed. R. Civ. P. 23(a)). If all Rule 23(a)

requirements are met, the class certification analysis proceeds to the type of class. Plaintiffs seek certification under Rule 23(b)(3), which is permissible when the court "finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Predominance "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation . . . Issues common to the class must predominate over individual issues . . . ." Hydrogen Peroxide, 552 F.3d at 310-11 (internal citations omitted).

"Factual determinations supporting Rule 23 findings must be made by a preponderance of the evidence." Id. at 307.

**F. Plaintiff's Class Certification Motion Will be Granted**

**1. Satisfaction of F.R.C.P. 23**

Plaintiff has satisfied the numerosity, typicality, and commonality requirements.

Plaintiff has shown that David Randall's faxes were sent to 29,113 unique numbers. The class is so numerous that joinder of all members is impracticable.

Defendants argue that the class is not ascertainable. Ascertainability entails two elements: "First, the class must be

31

defined with reference to objective criteria. Second, there must

be a reliable and administratively feasible mechanism for

determining whether putative class members fall within the class

definition." Hayes v. Wal-Mart Stores, Inc., 725 F.3d 349, 355

(3d Cir. 2013). "If class members are impossible to identify

without extensive and individualized fact-finding or 'mini-

trials,' then a class action is inappropriate." Marcus v. BMW of

N. Am., LLC, 687 F.3d 583, 593 (3d Cir. 2012). "Rule 23(a)(1)

does not require a plaintiff to offer direct evidence of the

exact number and identities of the class members. But . . . a

plaintiff must show sufficient circumstantial evidence specific

to the products, problems, parties, and geographic areas

actually covered by the class definition . . . ." Id. at 596.

Defendants cites Compressor Eng'g Corp. v. Mfrs. Fin.

Corp., 292 F.R.D. 433 (E.D. Mich. 2013), in which the district

court denied class certification because the class was not

ascertainable. The Compressor Engineering court held that

"certify[ing] a class of persons who 'were sent' certain fax

advertisements . . . . accomplishe[s] nothing in the way of

preventing multiple claims" because "a person who 'was sent' a

fax advertisement" is unclear: "does that include the person who

owned the fax machine, the person to whom the fax advertisement

was addressed, the person who happened to pick up the fax ad

32

from the machine, the person who opened the account and paid the bill for the telephone line that the fax machine used to receive signals, or all of the above?" Id. at 449.[5] The Compressor Engineering court also determined that individualized determinations would be necessary to ascertain class members because "it is not uncommon for one person or entity to be connected to a phone number used to send or receive fax transmission signals while another person or entity actually owns the fax machine that received a fax transmission via that telephone number on the date in question." Id. at 451.

In this case, however, the named Plaintiff owned the fax machine in 2006 and has always had the same fax number. In terms of the class, Plaintiff has provided data showing 29,113 unique fax numbers within specified zip codes. At oral argument, Plaintiff's counsel argued that determining the owners of the fax machines corresponding with the fax numbers would be feasible through the claims administration process. Other courts have agreed. See, e.g., G.M. Sign, Inc. v. Finish Thompson, Inc., Civ. 07-5953, 2009 WL 2581324, at *4 (N.D. Ill. Aug. 20, 2009) (plaintiff "may use the log and fax numbers to 'work

---

[5] The question of the person to whom the fax advertisement was addressed is not applicable because Defendants' fax advertisements were not addressed to anyone; the first words were "Roof Leaks??? Repairs Available."

backwards' to locate and identify the exact entities to whom the fax was sent"); G.M. Sign, Inc. v. Franklin Bank, S.S.B., Civ. 06-949, 2008 WL 3889950, at *3 (N.D. Ill. Aug. 20, 2008) ("Though the logs do not definitively establish the identities of the recipients without further investigation on the part of class counsel, they provide enough information to enable counsel to locate them"). This Court will follow the Northern District of Illinois and hold that this class is ascertainable based on the list of fax numbers who were successfully sent David Randall's advertisement in 2006.

In addition, there are common questions of law and fact because all class members have TCPA claims based on Defendants' mass advertising campaign. Because Defendants engaged in a mass campaign, common questions predominate. The legal claims are all the same, and the evidence, i.e. B2B's hard drive, is the same. The record does not indicate that City Select's claim is unique and, thus, Plaintiff's claim is typical of the class.

Defendants argue that individual questions of consent predominate and cite Forman v. Data Transfer, Inc., 164 F.R.D. 400, 404 (E.D. Pa. 1995), in which the district court held that there was "no common nucleus of operative facts present for the entire class" and the transmissions to each plaintiff

"necessarily occur[red] in different places, at different times
and under differing circumstances." Id. at 404.

Defendants' argument is unpersuasive. Forman was not a B2B
case. In the present case, there is no dispute that B2B compiled
lists of recipients based on geographic areas. Defendant has not
indicated that the fax recipients were people with whom David
Randall had established business relationships or who had
granted David Randall permission for advertisements. Plaintiff
has established a common nucleus of operative facts because all
members of the class received advertisements through the same
mass advertising campaign. In dicta, the Third Circuit approved
of a district court case holding that "the defendant's fax
broadcasts were transmitted en masse . . . and that, under these
circumstances, the consent question could be understood as a
common question." Landsman & Funk PC v. Skinder-Strauss
Associates, 640 F.3d 72, 94 (3d Cir. 2011) (discussing holding
in Hinman v. M&M Rental Center, Inc., 545 F. Supp. 2d 802 (N.D.
Ill. 2008)).[6] Judge Chesler of this Court has certified a class

---

[6] The primary issue in Landsman & Funk was federal jurisdiction
over TCPA claims. The Third Circuit granted rehearing en banc.
Landsman & Funk, 650 F.3d 311 (3d Cir. 2011). After the Supreme
Court issued Mims, the Third Circuit vacated the order granting
en banc rehearing and partially reinstated the original opinion.
Landsman & Funk, 09-3105, 2012 WL 2052685 (3d Cir. Apr. 17,
2012). The subsequent history does not impact the Third
Circuit's discussion of consent as a common question.

in a TCPA action based on B2B hard drive evidence, noting that
the evidence of a mass advertising campaign through B2B "tends
to negate individualized issues that often arise in TCPA cases,
such as whether any recipient consented to receive the fax . . .
or whether Defendant had a prior relationship with any
recipient." A & L Indus., Inc. v. P. Cipollini, Inc., Civ. 12-
07598 (SRC), 2013 WL 5503303, at *3 (D.N.J. Oct. 2, 2013); see
also Savanna Grp., Inc. v. Trynex, Inc., 10-CV-7995, 2013 WL
66181, at *3 (N.D. Ill. Jan. 4, 2013) (rejecting defendants'
consent-based arguments against class certification because "not
only have Defendants failed to offer specific evidence of
consent or a prior business relationship between [defendant] and
the intended fax recipients . . ., but it is undisputed that
[defendant] engaged a third-party, B2B, to send faxes"). There
is no suggestion in this record that David Randall Associates
supplied a customer or contact list to B2B for purposes of these
mass faxing solicitations. Essentially, because all the faxes
were sent through a mass campaign, individual questions of
consent do not predominate.

Defendants also argue that common issues do not predominate
because the proposed class members must prove, on an individual
basis, that the member received the fax. The Northern District
of Illinois disregarded this argument in CE Design Ltd. v. Cy's

Crabhouse North, Inc., 259 F.R.D. 135 (N.D. Ill. 2009). In ruling on a motion to certify a class of fax recipients, the Cy's Crabhouse court found that "B2B kept fax logs in connection with individual clients. There is no indication--and defendants have offered no evidence suggesting . . . commingled fax logs for different clients. Plaintiff has provided circumstantial proof of receipt by all of the numbers to which the fax logs indicate faxes were successfully sent . . ." Id. at 142. In other words, Plaintiff "has proffered the fax transmission logs documenting the contacts to whom [the fax broadcasting service] successfully sent the fax. These logs are sufficient . . . ." Holtzman v. Turza, 2009 WL 3334909, *5 (N.D. Ill. Oct. 14, 2009). This Court agrees. In addition, as discussed supra, Plaintiff's expert compiled a list of the fax numbers that were "successfully sent" and explained that a "successfully sent" message indicates that all phases or fax transmission were completed. The Court therefore finds that individualized questions of receipt do not predominate.

Plaintiff has satisfied the numerosity, typicality, commonality, and predominance requirements by a preponderance of the evidence of record in this motion.

## 2. Suitability of Class Representative

Defendants argue that City Select is not an adequate class representative. This argument lacks merit.

Defendants note that City Select published its fax number on the internet in 2006 and they argue that, by publishing its fax number, City Select consented to receive fax advertisements. Fax advertisements are not prohibited if the unsolicited advertisement is "from a sender with an established business relationship" and the sender obtained the fax number through an internet website. 47 C.F.R. § 64.1200(a)(4). The Federal Communications Commission specified that "senders of facsimile advertisements must have an EBR [existing business relationship] with the recipient in order to send the advertisement . . . . The fact that the facsimile number was made available in a directory, advertisement or website does not alone entitle a person to send a facsimile advertisement to that number." In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991 Junk Fax Prevention Act of 2005, 21 F.C.C.R. 3787, 3796 (2006)). In other words, publishing a fax number on a website, in and of itself, does not constitute consent to receive unsolicited fax advertisements. Even if City Select's website was the source of its fax number, there is no indication

that David Randall had an established business relationship with City Select.

At the second oral argument, Defendants cited multiple cases in which they claimed that courts found consent to receive fax advertisements through fax numbers on websites. A review of these cases shows that publishing a fax number on a website does not, in and of itself, constitute consent to receive unsolicited fax advertisements. For example, in CE Design Ltd. v. King Architectural Metals, Inc., 637 F.3d 721, 724-25 (7th Cir. 2011), the Seventh Circuit vacated a class certification in a TCPA case because the named plaintiff had published its fax number on its website, had "engendered doubts about his truthfulness," and had "signed a form that both authorized the publication of its fax number in the Blue Book of Building and Construction . . . and authorized the other subscribers to the Blue Book, such as [defendant], to 'communicate' with it, including via fax." The Seventh Circuit based its decision on the combination of these three factors and specifically noted that the Blue Book listing, which involved consenting to receive faxes from other Blue Book subscribers including the defendant, was "[m]ore important" than the fax number on the website. Id. at 725. There is no indication in the present record that B2B was transmitting fax solicitations to companies that were fellow

members with David Randall in a business directory whereby
members consented to receive faxed communications from one
another.

Defendant also cited Landsman & Funk, P.C. v. Lorman Bus.
Ctr., Inc., Civ. 08-481, 2009 WL 602019 (W.D. Wis. Mar. 9,
2009), in which the district court granted the defendant's
motion to dismiss and denied class certification. The defendant,
Lorman Business Center, sent the plaintiff faxes advertising
continuing education seminars. The district court held that
these fax advertisements were not unsolicited because the
plaintiff's president had previously submitted a seminar
enrollment form in which he listed the plaintiff's fax number.
The form explained that "PROVIDING YOUR FAX NUMBER CONSTITUTES
AN EXPRESS INVITATION TO SEND YOU FAX ADVERTISEMENTS ABOUT
FUTURE LORMAN SEMINARS." Id. at *2. The district court held that
the president's submission of this form constituted "express
permission to send fax advertisements to plaintiff's fax
number." Id. at *1. Similarly, in Practice Mgmt. Support Servs.,
Inc. v. Appeal Solutions, Inc., Civ. 09-1937, 2010 WL 748170
(N.D. Ill. Mar. 1, 2010), the district court granted summary
judgment to the defendants because the plaintiff's president had
visited the defendant's website, submitted a form on that
website that the defendant used to collect information from

people or businesses interested in its products, and provided plaintiff's contact information, including the fax number. The district court thus found "that plaintiff's voluntarily [sic] communication of its fax number precludes Practice Management from asserting that the faxes were unsolicited under the TCPA." Id. at *3.[7] None of the cases that Defendants cited hold that publishing a fax number on a website, without more, establishes consent to receive fax advertisements. Indeed, to hold that one who merely publishes its fax number thereby consents to unsolicited advertising solicitations would gut the remedial purposes of the TCPA, since publicly available fax numbers are the source of the recipient contact information to which unsolicited and unwanted faxes are sent.

Defendants also argue that Plaintiff's counsel, not Plaintiff, are controlling the litigation. Defendants argue that Plaintiff's counsel "are the actual parties in interest; that

---

[7] Defendants also cited W. Concord 5-10-1.00 Store, Inc. v. Interstate Mat Corp., Civ. 10-00356, 2013 WL 988621 (Mass. Super. Mar. 5, 2013), which is wholly inapplicable. The W. Concord court denied class certification because "[i]t is less clear that the named plaintiff has the ability and the incentive to vigorously represent the claims of the class. This is the fourth case he has brought; two of the other three were settled, at least one individually, and the third has been 'dropped.'" Id. at *5. There is no such evidence about City Select in the record before the Court. Moreover, the W. Concord court was a state court and it held that TCPA claims should be brought in small claims court. Massachusetts state law on class certification in TCPA cases is inapplicable here.

they illegitimately obtained and have maintained possession of the entire foundation on which this case is based – the subject hard drive; and that they have improperly solicited plaintiffs and manufactured 'evidence' through their possession of that drive." (Def. 1st Opp'n at 8.)

This argument lacks merit. "Experience teaches that it is counsel for the class representative and not the named parties, who direct and manage these actions. Every experienced federal judge knows that any statements to the contrary is sheer sophistry." Greenfield v. Villager Indus., Inc., 483 F.2d 824, 832 n.9 (3d Cir. 1973). In addition, the requirement that a class representative "fairly and adequately protect the interests of the class" seeks "to uncover conflicts of interest between named parties and the class they seek to represent." In re Warfarin Sodium Antitrust Litig., 391 F.3d 516, 532 (3d Cir. 2004). In other words, "the class representative must not have interests antagonistic to those of the class . . . ." Szczubelek v. Cendant Mortgage Corp., 215 F.R.D. 107, 119 (D.N.J. 2003). The record does not indicate any potential conflict of interest between City Select and other class members. City Select did not want to receive such faxes and Mr. Pellegrini testified to his "pet peeve" about junk faxes, which he regarded as wasting his money and stealing employee time, as discussed above. Although

he does not recollect the specific faxes in this case, he is far from indifferent to the issues and he appears to work well with the attorneys.

In addition, a class representative "need only possess 'a minimal degree of knowledge necessary to meet the adequacy standard.'" New Directions Treatment Servs. v. City of Reading, 490 F.3d 293, 313 (3d Cir. 2007) (quoting Szczubelek, 215 F.R.D. at 119). "[A] proposed representative's lack of particularized knowledge concerning the dispute at issue 'does not render her inadequate given the fact that she has retained adequate counsel to represent her.'" Szczubelek, 215 F.R.D. at 120 (quoting Ettinger v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 122 F.R.D. 177, 182 (E.D.Pa. 1988)). Moreover, "[t]his is a fax junk case, and the evidence is not complex. The same evidence of Defendant's advertising campaign will govern Plaintiff's claim and the claims of every other class member." Imhoff Inv., LLC v. SamMichaels, Inc., Civ. 10-10996, 2012 WL 2036765, at *4 (E.D. Mich. May 21, 2012) (named plaintiff satisfied adequacy requirements even though the class representative is a company whose principal has dementia).

The Court finds Mr. Pellegrini possesses more than minimal knowledge and motivation and that City Select is an adequate class representative.

### 3. Admissibility of Hard Drive Evidence

The admissibility of the hard drive evidence is integral to Plaintiff's case because the class' claims rest upon the B2B hard drive.

Plaintiff cites Caroline Abraham's affidavit to introduce the hard drive. Defendants argue that Caroline Abraham's affidavit is invalid because it "recites certain actions Ms. Abraham took which 'satisfied the items Anderson & Wanca was seeking,' but it does not identify any of the instructions or requests that the firm gave her." (Def. 1st Opp'n at 14.) Defendants challenge "the accuracy of that document and whether it was given in return for money and/or improper promises to protect her from third party suits." (Def. 1st Opp'n at 14.) Even if the affidavit were insufficient, it is not the only means of introducing the hard drive evidence. Plaintiff can, for example, subpoena Caroline and Joel Abraham or call Ryan Kelly to testify regarding the hard drive's chain-of-custody and the materials that he provided to Plaintiff's expert witness.

The Court finds prima facie evidence of the hard drive's admissibility. There is a foundation for its authenticity under Fed. R. Evid. 902 and for its recognition as a business record under Fed. R. Evid. 803(6). The Court will not find, at this time, that the hard drive is inadmissible without an evidentiary

hearing, particularly when it appears that Plaintiff can subpoena the principals to address potential evidentiary deficiencies. Moreover, the hard drive's admissibility is a common question applicable to all class members, thus supporting certification because the TCPA claims are "capable of proof through common evidence." Sullivan v. DB Investments, Inc., 667 F.3d 273, 305 (3d Cir. 2011).

Defendants' challenges to the hard drive's admissibility are not sufficiently weighty to defeat Plaintiff's showing of probable admissibility, let alone to preclude class certification.

### 4. Suitability of Class Counsel

Plaintiff's proposed class counsel are experienced lawyers who will adequately represent the class. Plaintiff submitted firm resumes for Sherman, Silverstein, Kohl, Rose & Podolsky, P.A.; Bock & Hatch, LLC; and Anderson & Wanca.[8]

In appointing class counsel, the Court must consider "(i) the work counsel has done in identifying or investigating potential claims . . .; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims

_____

[8] At the second oral argument, Plaintiff's counsel stated that they no longer sought Anderson & Wanca's appointment as class counsel. The Court will not consider Anderson & Wanca's credentials.

asserted . . .; (iii) counsel's knowledge of the applicable law;
and (iv) the resources that counsel will commit to representing
the class." Fed. R. Civ. P. 23(g)(1)(A).

The Court finds that Sherman, Silverstein, Kohl, Rose &
Podolsky, P.A. and Bock & Hatch, LLC have experience to
represent the class adequately. Bock & Hatch, in particular, has
litigated TCPA class action cases to successful resolution.

Defendants argue that Alan Milstein, who is with Sherman,
Silverstein, Kohl, Rose & Podolsky, P.A., is inadequate class
counsel because he moved late for class certification in
Winter's and settled the matter for $1,500. The Court disagrees.
In this action, Milstein moved promptly for class certification.
And, in Winter's, he obtained a reasonable settlement for his
client based upon the TCPA's statutory damages award.

Defendants emphasize that class counsel are inadequate
because Plaintiff's retainer agreement was signed by Brian Wanca
and Phillip Bock, two attorneys who have not appeared in this
case and who are not licensed in New Jersey. Phillip Bock is a
named partner at Bock & Hatch, which seeks appointment as class
counsel. Tod Lewis, a Bock & Hatch attorney, has represented
Plaintiff competently in multiple oral arguments, conference
calls, and court filings. Defendant has not cited any case law
denying appointment of class counsel because the named partner

46

signed a retainer agreement and a different attorney at the firm
handled the court appearances and filings. Defendant also has
not cited any case law denying class certification because the
attorneys on the retainer agreement are not licensed in a
particular state. In this case, Plaintiff's counsel has worked
with local counsel, Alan Milstein, who is licensed in New
Jersey, and Tod Lewis and other attorneys were admitted pro hac
vice. Moreover, the retainer agreement notes that "Attorneys may
retain other counsel to assist in the litigation." [Docket Item
88-1 at 1.] The names on the retainer agreement do not preclude
class certification.

Defendants assert that class counsel are also inadequate
because the retainer agreement states that "Client understands
and agrees that Attorneys will seek an attorneys fee award equal
to one-third of any benefit conferred upon the class, and Client
expressly agrees not to oppose Attorneys' request." [Docket Item
88-1 at 1.] Defendants cite another B2B case in which the named
plaintiffs had "agreed, in advance, not to contest a one-third
contingency fee request by counsel—regardless of the amount of
work actually performed by Counsel in these cases." Compressor
Eng'g Corp. v. Mfrs. Fin. Corp., 292 F.R.D. 433, 446 (E.D. Mich.
2013). The Compressor Engineering court found the fee agreement
to be "troubling . . . in light of the repetitive nature of

these actions and considering the amount of work actually performed by Counsel in relation to the settlements and/or judgments that have been obtained in other cases." Id.

The fee provision in the retainer agreement does not preclude class certification. The retainer agreement states that "any fee for Attorneys' services . . . is contingent upon gaining a recovery against or successful result from Defendant. **Attorneys will be compensated** <u>**only**</u> **if a successful result is achieved . . .** attorneys fees will be determined or approved by the court and will be payable solely by Defendant and/or out of any recovery or benefits obtained . . . ." [Id. (emphasis in original).] If a class is certified, the Court retains ultimate authority to approve a fee award and the Court will consider the work performed and the benefit conferred upon the class in this case, as well as all other appropriate factors, in making its determination.

Defendants also argue that Plaintiff's counsel's previous dealings with the Abrahams, Rubin, and Winter's show that they are unethical, inadequate class counsel. Even though the Court is only considering Sherman, Silverstein, Kohl, Rose & Podolsky, P.A., and Bock & Hatch, LLC, as class counsel, the Court will address these arguments because Defendants argue that those two

firms are involved with Anderson & Wanca, the allegedly
offending firm.

Defendants cite another case involving Anderson & Wanca and
the Abrahams' hard drive in which the Seventh Circuit stated,
"class counsel have demonstrated a lack of integrity that casts
serious doubt on their trustworthiness as representatives of the
class." (Def. 1st Opp'n at 5, citing Creative Montessori
Learning Centers v. Ashford Gear LLC, 662 F.3d 913, 917 (7th
Cir. 2011).)[9] But the Creative Montessori district court
certified the class on remand, after the Seventh Circuit's
opinion, and held that "any suggestion that Abraham sought
confidentiality to protect anyone but herself is pure sophistry,
as is the notion that the B2B records were produced with an
'understanding' of confidentiality." Creative Montessori
Learning Ctr. v. Ashford Gear, LLC, Civ. 09-3963, 2012 WL
3961307, *2 (N.D. Ill. Sept. 10, 2012). The district court also
noted that "[a]t least four district courts have analyzed class
counsel's adequacy . . . . None of those have found any reason
to doubt counsels' loyalty to their class, despite their methods
of obtaining plaintiffs' names." Id. Another district court, in

_____

[9] Defendants incorporated by reference all of the briefing and
exhibits from the Creative Montessori case.

assessing Anderson & Wanca's actions in obtaining the hard drive

and other materials from the Abrahams, stated,

> Although counsel's behavior may leave something to be
> desired, I nevertheless find that counsel's behavior
> does not affect its ability to vigorously pursue the
> class members' claims. I also find that denying class
> certification on possible ethical violations occurring
> in the context of a different case is an unnecessarily
> harsh remedy that would be a disservice to the
> potential class members in this case.

Reliable Money Order, Inc. v. McKnight Sales Co., Inc., 281

F.R.D. 327, 337 (E.D. Wis. 2012). The Court shares these

sentiments, especially with the benefit of the deposition

testimony of Wanca and Ryan obtained herein.

Moreover, there is no indication that either Anderson &

Wanca or Plaintiff's proposed counsel tampered with the B2B hard

drive or manufactured that evidence. Wanca's deposition

testimony indicates that he obtained the B2B hard drive so that

his firm could examine and retrieve the contents at its own

expense. He also testified that he intended to streamline his

system for reimbursing the Abrahams for document retrieval and

deposition time by having the Abrahams' attorney distribute

funds as needed, as opposed to writing many small checks

himself. His methods were, at best, clumsy, but there is no

indication that he sought to alter or otherwise corrupt the

Abrahams' testimony. "[U]nethical conduct . . . raises a

'serious doubt' about the adequacy of class counsel when the

misconduct jeopardizes the court's ability to reach a just and proper outcome . . . ." Reliable Money Order, Inc. v. McKnight Sales Co., Inc., 704 F.3d 489, 499 (7th Cir. 2013). "[A]ctions such as occurred here--which do not prejudice an attorney's client or undermine the integrity of judicial proceedings--do not mandate disqualification of counsel." Id. at 500 (analyzing Anderson & Wanca's conduct in obtaining B2B hard drive). This Court is not left with the impression that Wanca, by forwarding to the Abrahams' attorney Rubin a check for $5,000 marked "document retrieval," given the course of dealings of multiple small reimbursements previously sent through Rubin, was attempting to corrupt the process or to influence the Abrahams' testimony.

Absent evidence that class counsel will represent this class disloyally or incompetently or evidence that their actions will undermine the outcome, the Court will not find them inadequate. "[W]hen an ethical breach neither prejudices an attorney's client nor undermines the integrity of the judicial proceedings, state bar authorities are generally better positioned to address the matter through disciplinary proceedings, rather than the courts through substantive sanction in the underlying lawsuit." Id. at 502. In other words, "[w]hen assessing the adequacy of counsel, courts must distinguish and

disregard 'petty issues manufactured by defendants to distract the judge from his or her proper focus under Rule 23(a)(3) and (4) on the interests of the class.'" Imhoff Inv., LLC v. SamMichaels, Inc., 10-10996, 2012 WL 2036765, at *2 (E.D. Mich. May 21, 2012) (quoting CE Design Limited v. King Architectural Metals, Inc., 637 F.3d 721, 728 (7th Cir. 2011)).

Defendants assert that the solicitation letter, which Wanca sent to City Select, constituted the unauthorized practice of law and was an improper solicitation. A lawyer who is not admitted to New Jersey Bar and "is admitted to practice law before the highest court of any other state . . . may engage in the lawful practice of law in New Jersey only if . . . the lawyer is admitted to practice pro hac vice . . . or is preparing for a proceeding in which the lawyer reasonably expects to be so admitted and is associated in that preparation with a lawyer admitted to practice in this jurisdiction." N.J. R. RPC 5.5(b)(1). At oral argument, Plaintiff's counsel informed the Court that Brian Wanca had originally intended to seek pro hac vice admission.

Wanca's letter did not fully comply with the New Jersey Rules of Professional Conduct regarding solicitation, but it was not deceptive. The New Jersey Rules of Professional Conduct mandate that an unsolicited direct communication with a

prospective client must contain the word "ADVERTISEMENT;" a
notice stating that "Before making your choice of attorney, you
should give this matter careful thought. The selection of an
attorney is an important decision"; and an additional notice
stating "the recipient may, if the letter is inaccurate or
misleading, report same to the Committee on Attorney
Advertising." N.J. R. R.P.C. 7.3(b)(5). Wanca's letter did not
contain the two notices and the letter stated "Advertising
material," not "ADVERTISEMENT." These flaws do not preclude
class certification. The letter was identified as an
advertisement, and there is no indication that Wanca's letter
was false or misleading. The solicitation rules exist to protect
potential clients, not to help defendants combat potentially
meritorious claims. City Select has not complained about the
letter. Wanca's solicitation could merit further review before
permitting pro hac vice admission, if he sought such admission,
but it does not warrant denial of class certification. The Court
should not penalize the proposed class by denying certification
on the basis of an attorney who is not proposed as class
counsel.

Defendants also argue that Plaintiff's counsel unethically
promised the Abrahams that they would not be sued and that
Plaintiff should have sued the Abrahams, not the Defendants.

Plaintiff's counsel represented, at the second oral argument,
that there are multiple judgments against the Abrahams,
including a $2,000,000.00 judgment that the State of Indiana
obtained; that Caroline Abraham drives an old car; and that she
has four college-age children. Plaintiff's counsel perceive that
the class would be unable to recover a judgment against the
Abrahams because she is insolvent. There is no doubt that
"Caroline Abraham and her company Business-to-Business Solutions
("B2B") sit at the center of . . . scores of [lawsuit]s."
Reliable Money Order, Inc. v. McKnight Sales Co., Inc., 704 F.3d
489, 491 (7th Cir. 2013). Plaintiff's counsel's assessment that
the class would probably never be able to recover upon any
judgment against the Abrahams is reasonable, and the strategic
decision not to sue the Abrahams does not indicate that
Plaintiff's counsel will disloyally represent the class.

Defendants also note that Plaintiff filed opposition to
Defendants' motion for default against the Abrahams, who are
third-party defendants in this case. While Plaintiff's response
was curious,[10] it did not impact the Court's adjudication and

---

[10] Plaintiff's response to Defendants' default motion argued that
"there is no valid right of contribution or indemnification,
explicit or implicit, between TCPA tortfeasors" and that
Defendants were strictly liable for sending the faxes. [Docket
Item 43 at 2.] At a hearing on December 14, 2012, the Court

grant of the default motion under Rule 55(a), Fed. R. Civ. P.,
which directed the Clerk to enter default against the Third-
Party Defendants. [Docket Item 53.]

Essentially, while the Court "neither approve[s] of nor
condone[s] the actions of Anderson + Wanca attorneys when
investigating the claims in this suit, [the Court] nevertheless
do[es] not conclude that counsels' questionable performance in
the investigative stage of this case prevents class
certification." Reliable Money Order v. McKnight Sales, 704 F.3d
at 491. This is all the more true in the present case where
Anderson & Wanca are not candidates for class counsel.

Sherman, Silverstein, Kohl, Rose & Podolsky, P.A. and Bock
& Hatch, LLC are adequate class counsel.[11]

---

granted default against the Third-Party Defendants [Docket Item
53].

[11] At the second oral argument, Defendants cited Kramer v.
Scientific Control Corp., 534 F. 2d 1085 (3d Cir. 1976). Kramer
is inapt. In Kramer, the Third Circuit reviewed the district
court's denial of a motion to disqualify class counsel, but it
did not review the class certification decision. The question
before the Kramer court was "[m]ay a member of the bar who is a
plaintiff class representative in a class action . . . designate
as his counsel a member or employee of his law firm?" Id. at
1086. The Third Circuit held that there was an appearance of
impropriety and reversed the district court. In this case, the
named Plaintiff City Select and its representative Louis
Pellegrini are not attorneys or employees of either Sherman,
Silverstein, Kohl, Rose & Podolsky, P.A. or Bock & Hatch, LLC.
The Kramer court did not hold that an appearance of impropriety
regarding class counsel precludes class certification; in fact,
the Third Circuit noted that "it should not require new counsel

## 5. Proposed Class Definition

Plaintiff's proposed class definition is:

> All persons who were successfully sent one or more faxes during the period March 29, 2006, through May 16, 2006, stating, "ROOF LEAKS??? REPAIRS AVAILABLE Just give us a call and let our professional service technicians make the repairs!" and "CALL: David/Randall Associates, Inc. TODAY."

(Pl. Class Certification Mot. at 1.)

Defendants argue that the class definition should preclude persons who solicited the advertisements or who had business relationships with David Randall. In addition, Defendants argue that the definition should specify that persons actually received the fax.

The Court will not change the verb "sent" to "received." The TCPA makes it unlawful "to send, to a telephone facsimile machine, an unsolicited advertisement." 47 U.S.C. § 227(b)(1)(C). The TCPA "does not specifically require proof of receipt." CE Design Ltd. v. Cy's Crabhouse N., Inc., 259 F.R.D. 135, 142 (N.D. Ill. 2009). The class definition will follow the statute's language, using the verb "sent." In addition, Defendants' concerns are addressed because Plaintiff has

---

an inordinate amount of time to become sufficiently familiar with the case to proceed to trial." Id. at 1093. Even if Anderson & Wanca's conduct created an appearance of impropriety, that firm will not be certified as class counsel.

restricted the class definition to include only recipients who were "successfully" sent the advertisements.

Defendants' argument regarding solicitation is meritorious. The Court will amend the class definition to include the word "unsolicited" because the TCPA only prohibits unsolicited faxes. In addition, the Court will add language excluding recipients who had established business relationships with David Randall because the TCPA outlines an exception, discussed above, for recipients with whom the sender had an established business relationship.

There is no indication in this record that any class member solicited these faxes or had an established business relationship with David Randall. There have been other cases, not involving B2B, in which recipients explicitly or implicitly consented to receiving fax advertisements, such as by enrolling in a business directory permitting mutual solicitations among members. See, e.g., CE Design Ltd. v. King Architectural Metals, Inc., 637 F.3d 721 (7th Cir. 2011). In this case, the list of recipients was based on geographic proximity, but there is a logical possibility that somebody on the list of 29,113 unique fax numbers had a prior business relationship or had requested advertisements from David Randall. David Randall Associates has not suggested that it supplied a single listing to be included

in the B2B fax broadcasts but, given the logical possibility, the class definition will track the statutory language. These two additions will not impact ascertainability.[12] The class definition will exclude recipients with a prior business relationship or recipients who solicited advertisements, and such recipients can also be excluded during any claims administration process following a class based judgment or settlement.

The Court will also add "or entities" to the first clause to make clear that the class includes both "persons" and "entities." This addition follows the TCPA's language, which provides a private right of action to "[a] person or entity." 47 U.S.C. §227(b)(3).

_____

[12] In other words, the class membership is presently comprised of the persons or entities whose fax numbers are among the successful transmissions on the B2B hard-drive list for the relevant broadcasts. This case is over thirty months old and, after ample class-based discovery, Defendant David Randall has proffered no evidence that any of its customers appear on this list and no evidence of circumstances from which one could be concerned that someone on the B2B list solicited these faxed advertisements. B2B, not David Randall, assembled the list of targeted fax addresses in the vicinity without any input of customer lists from David Randall. In the unlikely event that persons or entities with such business relationships as of 2006 with David Randall are identified (and only David Randall would be in possession of such information), proper steps can be taken to exclude such recipients from the class in accordance with the class definition. The Court cannot speculate that there would be such exclusions on the basis of the present record.

The class definition will be as follows, with the Court's additions in bold:

> All persons **or entities, with whom David Randall Associates did not have an established business relationship,** who were successfully sent one or more **unsolicited** faxes during the period March 29, 2006, through May 16, 2006, stating, "ROOF LEAKS??? REPAIRS AVAILABLE Just give us a call and let our professional service technicians make the repairs!" and "CALL: David/Randall Associates, Inc. TODAY."

Finally, the prospect that there may be multiple recipients at a single fax machine need not complicate the class definition. Any recovery will be based upon the transmissions that were "successfully sent" because the TCPA permits recovery for "each" unsolicited fax transmission. 47 U.S.C. § 227(b)(3). The Compressor Engineering court denied class certification because it found that the "successfully sent" language was vague and would permit multiple claims based on a single fax transmission. The Court disagrees. The TCPA's language does not permit multiple recipients to each recover the full damages award from a single fax transmission. If there were multiple recipients for a single transmission because, for example, a fax machine was shared in ownership or lease obligations, then the recovery must be divided between the recipients. At most, this may be an issue for an eventual distribution of any recovery

that can be easily handled in the claims administration process, if a class recovery occurs.

### 6. Settlement Pressure

Defendant argues that class certification will cause unwarranted settlement pressure.

It is recognized that "class certification 'may force a defendant to settle rather than incur the costs of defending a class action and run the risk of potentially ruinous liability.'" Hydrogen Peroxide, 552 F. 3d at 310 (quoting Fed. R. Civ. P. 23 advisory committee's note, 1998 Amendments). The Court must weigh "the potential for unwarranted settlement pressure" in its "'certification calculus.'" Id. (quoting Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 259 F.3d 154, 167 n.8 (3d Cir. 2001)). The Third Circuit has explained that "granting class certification . . . may . . . create unwarranted pressure to settle nonmeritorious claims on the part of defendants" and, thus, the district court must be "attentive[] to 'the potential for unwarranted settlement pressure.'" Marcus v. BMW of N. Am., LLC, 687 F.3d 583, 591 at n.2 (3d Cir. 2012) (quoting Hydrogen Peroxide, 552 F.3d at 310).

In this case, David Randall does not dispute that it engaged in this fax advertising campaign and used B2B to send these advertisements. In other words, there is no indication

that Plaintiff's claims are "nonmeritorious." Unwarranted settlement pressure does not preclude class certification.

### 7. Common Questions of Law and Fact

Consistent with Rule 23(c), Fed. R. Civ. P., an order certifying a class must identify the common questions of law or fact that are embraced within the class action. The Court agrees that at least six main common questions will be addressed in this class action: (1) whether the B2B hard drive evidence is admissible; (2) whether Defendants' fax constitutes an advertisement; (3) whether Defendants violated the TCPA by sending the advertisements without permission of the recipients; (4) whether Plaintiff and other class members are entitled to statutory damages; (5) whether Defendants' actions were willful and knowing under the TCPA and, if so, whether the Court should treble the statutory damages; and (6) whether the Court should enjoin Defendants from future TCPA violations. These will be certified in the accompanying Order.

### 8. Requirement of Notice to Class

Class counsel shall endeavor to draft a proposed form of order and notice to the members of the class in compliance with the requirements for a Rule 23(b)(3) class certification as set forth in Rule 23(c)(2)(B). If all counsel are unable to agree to a form of notice, Class Counsel shall file an appropriate motion

within twenty-one (21) days of the entry of the accompanying Order.

**IV.   CONCLUSION**

Plaintiff's motion for class certification is granted. Sherman, Silverstein, Kohl, Rose & Podolsky, P.A. and Bock & Hatch, LLC are appointed class counsel. The accompanying Order is entered.


**December 20, 2013**                    **s/  Jerome B. Simandle**
Date                                     JEROME B. SIMANDLE
                                         Chief U.S. District Judge